United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 13, 2004**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY, 11, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-30743
_____

UNITED STATES OF AMERICA

                                    Plaintiff - Appellee

     v.

MELROSE EAST SUBDIVISION, THIRD FILING,
EAST BATON ROUGE PARISH LOUISIANA; Et Al.

                                    Defendants

------------------------------------------

LYMAN D WHITE

                                    Claimant - Appellant

_____

Appeal from the United States District Court
for the Middle District of Louisiana
_____

Before KING, Chief Judge, DENNIS, Circuit Judge, and LYNN,
District Judge.[*]

KING, Chief Judge:

     The United States filed a civil forfeiture complaint in the

district court and on the same day obtained a pretrial

restraining order under 18 U.S.C. § 983(j)(1)(A) enjoining the

---

     [*]   District Judge for the Northern District of Texas,
sitting by designation.

transfer of the defendant property. A claimant to the property, who was indicted on federal charges as part of the same investigation that led to the civil forfeiture complaint, filed a motion in the district court seeking to modify the restraining order to release funds needed to retain an attorney in the related criminal case. After an evidentiary hearing, the district court denied the motion, finding that the government had established probable cause to restrain the assets. The claimant appeals.

We decide that the standard of proof to be employed in ruling on such a motion is probable cause, and we agree with the district court that the government satisfied that standard. We accordingly affirm the district court's denial of the motion to modify the restraining order.

## I. BACKGROUND

This civil forfeiture proceeding arises from a Medicaid fraud investigation into the activities of Drug and Alcohol Counseling, Inc. ("DAC"), a corporation owned and operated by Claimant-Appellant Lyman D. White. In addition to spawning this forfeiture action, the investigation has led to the indictment of White and three others connected to DAC.

Located in Baton Rouge, DAC received Medicaid reimbursements for providing substance abuse treatment to local youths. Medicaid paid DAC a total of approximately $175,000 for all of

2

1998.  DAC's activities therefore aroused suspicion when, by September 1999, DAC's billings had risen to over $1 million for the year to date, with many of DAC's monthly billings rivaling the total for the whole of the previous year.  The Louisiana Department of Health and Hospitals ("DHH"), which administers the state's Medicaid program, instructed Unisys, the private company that serves as DHH's claims intermediary, to examine DAC's billing activity.  Unisys determined that an on-site review was warranted.  At that review, held in October 1999, Unisys analysts noted that DAC employees were inordinately slow in providing the patient charts that the analysts requested.  The government has since suggested, based on interviews with DAC employees, that the suspicious delay resulted from the employees needing time to falsify the charts that were requested by the Unisys analysts.  By early November 1999, Unisys decided that the situation at DAC was sufficiently serious to justify withholding future Medicaid payments.  This determination was upheld after a hearing conducted later that month.

The investigation then continued at higher levels.  Beginning in late December 1999, DHH's Program Integrity Staff began calling some of the clients reflected on DAC's Medicaid billings.  Of the twenty-five clients selected, only thirteen could be located.  Seven of those contacted were unaware of DAC, five said that they attended DAC but only for tutoring or recreational programs (activities which, while laudable, did not

3

entitle DAC to Medicaid payments), and only one mentioned a drug addiction.  Based on these phone calls, together with the on-site review, the case was referred to the Medicaid Fraud Control Unit, which launched a criminal investigation in January 2000.  The FBI soon joined the effort as well.  Federal and state investigators eventually interviewed a total of thirty-nine youths who had supposedly received substance abuse counseling at DAC.  Ten denied any knowledge of DAC, and the rest referred to DAC as a camp or youth program where they went for tutoring and recreational activities.  None of them said they received substance abuse treatment at DAC of the type for which DAC was billing Medicaid.

The investigation later spread beyond DAC and White.  Agents learned that White had formed a personal relationship with Marion Slaton, a manager in a department of Unisys responsible for fraud detection.  They learned that, at some point in February 1999, she had given White a list of juvenile Medicaid recipients in East Baton Rouge Parish.  Slaton knew that it was illegal to give White this list, which contained all of the identifying information necessary to file Medicaid claims in the juveniles' names.  The spike in DAC's Medicaid billings, noted earlier, began shortly after Slaton gave White the list.  Slaton used her position at Unisys to shield DAC's questionable billings from review.  She later accepted several thousand dollars from White, though at least some of this money might be attributable to

4

Slaton's status as White's "girlfriend," rather than to kickbacks.

Investigators also learned that White contacted Dana White (no relation) in April 1999 about an opportunity to expand the business of Dana White's company, Healthcare Laboratory Services, LLC ("HLS"). HLS soon began filing false Medicaid claims using patient information supplied by White, and Dana White in turn paid kickbacks to DAC. At White's behest, Dana White also made payments to Slaton to ensure that HLS's increased Medicaid billings would not come under scrutiny.

As part of the growing investigation, agents examined DAC's financial records. During the early part of 1999, Unisys electronically deposited DAC's Medicaid reimbursements into DAC's account at Liberty Bank. At some point in April, White opened an account at Dryades Bank, and the deposits began to flow there instead. The agents formed a basis to believe that White had funneled DAC's increased (and fraudulent) Medicaid revenues from those bank accounts into purchases of real estate and annuities. As a result, on August 22, 2001, the government filed a civil complaint for forfeiture, under 18 U.S.C. § 981 and § 985, against six parcels of real property and three annuities purchased with funds allegedly derived from the DAC scheme. According to the government, the property was subject to forfeiture under both § 981(a)(1)(A) as property involved in a money laundering offense and § 981(a)(1)(C) as property that

5

"constitutes or is derived from proceeds traceable to" a federal health care offense. The complaint was accompanied by a declaration by one of the investigating FBI agents, which recounted facts that avowedly showed probable cause to believe that the government's forfeiture claim was meritorious. The government simultaneously requested, and the district court on the same day issued, an ex parte pretrial restraining order under § 983(j)(1)(A). The restraining order generally enjoined the sale, pledge, or any other means of disposing of the property without the court's approval. The order further provided that any person wishing to transfer the property could do so, with the government's permission, as long as the proceeds were put into an escrow account which would itself be forfeited to the government if the government prevailed on the merits of the case. According to the terms of the order, it remained in force "until judgment is rendered on the civil forfeiture complaint . . . or until further order of the Court."

White was indicted a few months later, on October 31, 2001, for offenses arising from the same events described in the civil forfeiture complaint. On November 26, White filed a motion seeking either an adversary hearing on the restraining order or the release of restrained funds to the extent that he needed the funds to pay for his defense attorney in the criminal case. The government opposed the motion. The government contended that funds needed to pay counsel are not exempt from forfeiture, and,

6

moreover, the government argued that White was not even entitled to a hearing on the restraining order unless he first showed both that he lacked any other funds with which to pay counsel and that there was no probable cause to believe that the restrained assets were subject to forfeiture.[1]  The district judge held a hearing on March 22, 2002.  The hearing transcript shows that the parties and the court were at times uncertain as to the standards and procedures that should be employed in ruling on White's motion. The court appears to have orally ruled that White need not make the threshold showings requested by the government and that the government would instead bear the initial burden of showing that it was substantially likely to prevail on the merits of its forfeiture claim.  To satisfy that burden, the government tendered the declaration that accompanied the forfeiture complaint, White's indictment, the factual statements adopted by Dana White and Slaton as part of their plea bargains, and several charts tracing the connections between DAC's Medicaid receipts and the restrained assets.  The court did not receive any live testimony during the hearing, although White asked to question

---

[1]    White's November 26 motion referred to an affidavit in which White swore that the restrained funds were needed to pay counsel, but the affidavit was apparently not included in the government's copy of the motion.  The government later received a copy of the affidavit, but the government continued to assert that White had other assets that he could use to pay his attorney.  At the subsequent hearing on White's motion, the government accordingly asked the district court to examine White about the availability of other funds before entertaining the motion to release funds from the restraining order.

7

some of the government witnesses.  Both sides filed post-hearing briefs arguing whether the government had met the burden set forth by the district court, and the government additionally filed a motion asking the court to reconsider its procedural rulings on the allocation of the burden of proof.

In a written order dated April 17, 2002, the district court ruled that the government had met its initial burden and that it was therefore necessary for White to "adduce evidence and present his case" at an evidentiary hearing, which was set for May 1. The court denied the government's motion to reconsider as moot.

At the May 1 hearing, the court suggested that its rulings at the March 22 hearing had been "a little too hard" on the government.  After reflecting on the Supreme Court's decision in United States v. Monsanto, 491 U.S. 600 (1989), the court now believed that the pretrial restraining order should be continued as long as there was probable cause to believe that the property was subject to forfeiture.  Over the government's protestations, the court permitted White's attorneys to contest the existence of probable cause by examining three government witnesses: the two lead investigating agents and Slaton.  At the conclusion of the hearing, the court expressed its view that the examinations had only bolstered the government's showing of probable cause.  A written ruling later formalized the court's denial of White's motion to modify the restraining order to release funds needed to pay counsel in his criminal case.

8

White now appeals the decision to continue the pretrial restraining order.[2] He argues that the district court should have applied a standard higher than that of probable cause or, if probable cause is the proper standard, that the evidence failed to meet that standard.

## II. STANDARD OF REVIEW

Although the district court's ultimate decision to grant, deny, or continue injunctive relief is reviewed only for abuse of discretion, Castillo v. Cameron County, 238 F.3d 339, 347 (5th Cir. 2001), the district court abuses its discretion if it grounds its decision on an erroneous view of the governing legal standards, Cargill, Inc. v. United States, 173 F.3d 323, 341 (5th Cir. 1999). The question whether the district court applied the proper standard of proof is a question of law that we review de novo. See Stevens Shipping & Terminal Co. v. Japan Rainbow II MV, 334 F.3d 439, 443 (5th Cir. 2003). In addition, "[a]lthough we review the district court's finding of facts for clear error, the question of whether the facts are sufficient to constitute probable cause is a question of law, which we review de novo."

---

[2] We entertain this appeal under 28 U.S.C. § 1292(a)(1), which confers jurisdiction over appeals of "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." See United States v. Floyd, 992 F.2d 498, 499–500 (5th Cir. 1993) (holding that § 1292(a)(1) provides jurisdiction to review decisions regarding pretrial asset restraining orders issued under 21 U.S.C. § 853(e), the criminal analogue to 18 U.S.C. § 983(j)); see also United States v. Kirschenbaum, 156 F.3d 784, 788 (7th Cir. 1998) (citing cases).

<u>United States v. 1988 Oldsmobile Cutlass Supreme 2 Door</u>, 983 F.2d 670, 673 (5th Cir. 1993).

### III. DISCUSSION

White contends that the district court erred both by employing the probable cause standard and in determining that the evidence satisfied that standard.  We first decide the evidentiary standard that the district court should employ in ruling on a motion to modify a pretrial restraining order under 18 U.S.C. § 983(j)(1)(A).  This precise question is a matter of first impression, though the Supreme Court has provided guidance in a closely related context.

**A.    Standard Under 18 U.S.C. § 983(j)(1)(A)**

The government seeks the civil forfeiture of the defendant properties under the authority of 18 U.S.C. § 981.  The statutory provision authorizing pretrial restraining orders in civil forfeiture proceedings is found in 18 U.S.C. § 983, and it provides in relevant part:

> (1) Upon application of the United States, the court may enter a restraining order or injunction . . . or take any other action to seize, secure, maintain, or preserve the availability of property subject to civil forfeiture—
>
>> (A) <u>upon the filing of a civil forfeiture complaint</u> alleging that the property with respect to which the order is sought is subject to civil forfeiture; or
>>
>> (B) <u>prior to the filing of such a complaint</u>, if, after notice to persons appearing to have an interest in the property and opportunity for a hearing, the court determines that—

10

> (i) there is a substantial probability that the United States will prevail on the issue of forfeiture and that failure to enter the order will result in the property being destroyed, removed from the jurisdiction of the court, or otherwise made unavailable for forfeiture; and
>
> (ii) the need to preserve the availability of the property through the entry of the requested order outweighs the hardship on any party against whom the order is to be entered.

18 U.S.C. § 983(j) (2000) (emphasis added). This provision, along with all of the civil forfeiture procedures set forth in § 983, is a product of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202. As the restraining order in this case was requested contemporaneously with the filing of the forfeiture complaint, issuance of the restraining order was authorized under paragraph (A) above. Paragraph (A) makes no mention of a hearing, either before or after issuance of the restraining order. The absence of any mention of a hearing is notable because paragraph (B), which concerns pre-complaint restraining orders, says that such orders may issue only after notice and an opportunity for a hearing. In this case, the district court did not hold a hearing before issuing the restraining order, and White does not contend that it should have held a pre-restraint hearing.[3]

---

[3] This case therefore does not implicate the question whether the district court may in its discretion hold a pre-restraint hearing, or indeed whether it must hold a pre-restraint hearing as a matter of due process. There is authority for the proposition that due process does not require a pre-restraint hearing in the context of post-indictment restraining orders

The government recognizes, however, that considerations of due process can require the court to hold a post-restraint pretrial hearing in certain circumstances.  Although there does not seem to be a reported holding to this effect regarding the still fairly new provision at issue here, 18 U.S.C. § 983(j), authorities interpreting its criminal analogue, 21 U.S.C. § 853(e), are in broad agreement that due process requires the district court to hold a prompt hearing at which the property owner can contest the restraining order——without waiting until trial to do so——at least when the restrained assets are needed to pay for an attorney to defend him on associated criminal charges. See United States v. Jones, 160 F.3d 641, 645-48 (10th Cir. 1998); Monsanto, 924 F.2d at 1203; United States v. Moya-Gomez, 860 F.2d 706, 729-30 (7th Cir. 1988); United States v. Harvey, 814 F.2d 905, 928-29 (4th Cir. 1987), superceded as to other issues, In re Forfeiture Hearing as to Caplin & Drysdale, Chartered, 837 F.2d 637 (4th Cir. 1988) (en banc), aff'd, 491 U.S. 617 (1989).[4]  Other courts have held that due process

under 21 U.S.C. § 853(e)(1)(A), the criminal analogue of § 983(j)(1)(A).  See United States v. Monsanto, 924 F.2d 1186, 1192-93 (2d Cir. 1991) (en banc), on remand from 491 U.S. 600 (1989); United States v. Musson, 802 F.2d 384, 387 (10th Cir. 1986).  But cf. United States v. James Daniel Good Real Prop., 510 U.S. 43, 52-57, 62 (1993) (holding that due process requires a hearing before the government may seize real property pending the resolution of a civil forfeiture action).

    [4]    The Eleventh Circuit, on the contrary, holds that no pretrial hearing is required under 21 U.S.C. § 853(e) even when the restrained assets are needed to pay counsel.  See United

12

requires that a claimant to assets that have been civilly seized

be afforded a prompt opportunity to challenge the seizure when

the assets are needed to pay counsel in a related criminal case.

See United States v. Farmer, 274 F.3d 800, 805 (4th Cir. 2001);

United States v. Michelle's Lounge, 39 F.3d 684, 700-01 (7th Cir.

1994).

Note that neither due process, nor the Sixth Amendment right

to counsel, requires that assets needed to pay an attorney be

exempted from restraining orders or, ultimately, from forfeiture.

Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 623-

35 (1989); Monsanto, 491 U.S. at 616.  Rather, the constitutional

requirement set forth in the circuit court cases cited above is

_____

States v. Bissell, 866 F.2d 1343, 1354 (11th Cir. 1989); see also
United States v. Register, 182 F.3d 820, 835 (11th Cir. 1999)
("We appear to be the only circuit holding that, although
pre-trial restraint of assets needed to retain counsel implicates
the Due Process Clause, the trial itself satisfies this
requirement.").  The government concedes that the better view is
that embraced by the other authorities.
    This court has held that the requirements of Federal Rule of
Civil Procedure 65, including Rule 65's hearing requirements and
time limits on ex parte restraining orders, apply to ex parte
restraining orders and injunctions issued under 21 U.S.C.
§ 853(e)(1)(A).  See United States v. Thier, 801 F.2d 1463, 1468-
69 (5th Cir. 1986), modified, 809 F.2d 249 (5th Cir. 1987);
accord United States v. Crozier, 777 F.2d 1376, 1384 (9th Cir.
1985).  Contra United States v. Jamieson, 189 F. Supp. 2d 754,
756 (N.D. Ohio 2002).  Thier's hearing requirement would
evidently apply without regard to whether the restrained assets
are needed to pay counsel.  In today's case, which involves the
added element of the Sixth Amendment right to counsel, the
district court did hold a post-restraint hearing.  Thus, we have
no need to consider the issue whether post-restraint hearings are
more generally appropriate under 18 U.S.C. § 983(j)(1)(A), as
Thier apparently envisioned they would be under 21 U.S.C.
§ 853(e)(1)(A).

13

simply a requirement that the district court in certain circumstances hold a hearing on the restraining order and make a determination that the assets are properly subject to forfeiture. Because the district court held a hearing in this case, and because the government does not dispute that due process can require such hearings, we can assume without deciding that due process can mandate a post-restraint hearing under § 983(j)(1)(A), at least in certain circumstances. But in order to resolve White's appeal, we do need to decide the question of the standard of proof that should be used in such a post-restraint hearing. In particular, we must decide whether the district court erred in continuing the restraining order based on a showing of probable cause to believe that the assets were subject to forfeiture.

According to White, the government should not be permitted to restrain assets that he needs to pay his criminal counsel unless the government can make a post-restraint showing that it is likely to succeed on the merits of the forfeiture action. Essentially, the government would be required to meet the burden generally imposed on parties seeking preliminary injunctions, which is presumably somewhat higher than a mere showing of probable cause. In support of that proposition, White relies on our decision in <u>United States v. Thier</u>, 801 F.2d 1463 (5th Cir. 1986), <u>modified</u>, 809 F.2d 249 (5th Cir. 1987), which applied the substantial-likelihood-of-success-on-the-merits standard in the

14

context of 21 U.S.C. § 853(e)(1)(A), which authorizes post-indictment, pretrial restraining orders in criminal forfeiture cases.  White further explains that the ultimate showing required for the government to succeed on the merits of a civil forfeiture action recently changed with the passage of CAFRA in April 2000. Before CAFRA, the government could prevail on the merits of a civil forfeiture action merely by showing probable cause to believe that the subject property was forfeitable.  After CAFRA, however, the government can prevail on the merits only by establishing forfeitability by a preponderance of the evidence. 18 U.S.C. § 983(c)(1) (2000).  Combining CAFRA's higher standard of proof with Thier's statements regarding the standard for pretrial restraining orders, White concludes that the government should be required to defend its § 983(j)(1)(A) pretrial restraining order by showing that it is substantially likely to succeed at trial in proving by a preponderance of the evidence that the assets are subject to forfeiture.  Again, in White's view, what is required is basically the familiar inquiry into whether a plaintiff is entitled to a preliminary injunction.

According to the government, a pretrial restraining order issued under § 983(j)(1)(A) should be continued if the government shows probable cause to believe that the assets are subject to forfeiture.  To the extent that White would read Thier to say otherwise, the government contends that the issue is instead controlled by the Supreme Court's post-Thier decision in United

15

States v. Monsanto.  In Monsanto, which involved a restraining order under a criminal forfeiture statute, the Supreme Court held that due process permitted the government to restrain assets needed to pay attorneys' fees as long as the government showed that there was probable cause to believe that the assets were subject to forfeiture.  491 U.S. at 615-16.  Regarding the impact of CAFRA, the government argues that while CAFRA increased the standard of proof on the merits of a civil forfeiture case, CAFRA does not affect the standard at a due process hearing challenging a pretrial restraining order.  On that issue, according to the government, Monsanto still controls.[5]

---

[5]    Although the government believes that the district court applied the proper standard of proof (i.e. probable cause) and correctly concluded that probable cause was present, the government also argues that the district court should not have held a hearing in the first place because White did not make a sufficient threshold showing that the restrained funds were necessary to pay counsel.  White presented an affidavit stating that he had no other funds with which to pay for a defense attorney, and there were suggestions, which the district judge apparently credited, that White had been found to qualify for appointed counsel in the related criminal prosecution.  This showing appears quite similar to the showings described in cases that, according to the government's own argument, set forth the proper threshold showing.  See, e.g., Farmer, 274 F.3d at 802, 804.  Since the district court decided to hold a hearing and the government still prevailed, we think it would be imprudent to use this case to elaborate the precise details of the circumstances and showings necessary to trigger a due process hearing—a constitutional question that we are not required to decide here.  Cf. Monsanto, 491 U.S. at 615 n.10 ("[G]iven that the Government prevailed in the District Court notwithstanding the hearing, it would be pointless for us now to consider whether a hearing was required by the Due Process Clause.").

16

Having weighed the parties' contentions, we are persuaded that probable cause is the proper standard of proof for continuing a pretrial restraining order under § 983(j)(1)(A). Under pre-CAFRA law, property could be civilly forfeited to the government under 18 U.S.C. § 981 based merely on a showing of probable cause to believe that the property was implicated in certain offenses, unless the claimant could establish, by a preponderance of the evidence, that some defense was applicable or that the property was otherwise not subject to forfeiture. See United States v. $9,041,598.68, 163 F.3d 238, 246 (5th Cir. 1998); United States v. 1988 Oldsmobile Cutlass Supreme 2 Door, 983 F.2d 673-74 (5th Cir. 1993).[6]  Courts consistently held that this scheme comported with due process.  See United States v. One Beechcraft King Air 300 Aircraft, 107 F.3d 829, 829-30 (11th Cir. 1997) (per curiam) (collecting cases).  Moreover, the government could seize property pending the resolution of the forfeiture case, and this too required no more than probable cause.  See 18 U.S.C. § 981(b)(2) (1994); Marine Midland Bank, N.A. v. United States, 11 F.3d 1119, 1124-26 (2d Cir. 1993); United States v.

---

[6]  Section 981 is a generic provision that provides for civil forfeiture of property involved in a host of offenses.  See 18 U.S.C. § 981(a)(1) (2000) (listing offenses).  Federal law also contains a number of specific civil forfeiture provisions tied to particular regulatory regimes.  The discussion here focuses on the background of § 981 because it is the provision that authorizes the forfeitures at issue in this case.

17

One 1978 Mercedes Benz, Four-Door Sedan, 711 F.2d 1297, 1302-03 (5th Cir. 1983).[7]

Congress enacted CAFRA in 2000 in order to "provide a more just and uniform procedure for Federal civil forfeitures."  Pub. L. No. 106-185 pmbl., 114 Stat. 202, 202.[8]  CAFRA added 18 U.S.C. § 983, which sets forth a uniform (though not comprehensive) set of procedures and standards applicable to most civil forfeiture proceedings.  Among other changes, CAFRA increased the government's required showing on the merits: "In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that

---

[7]  One 1978 Mercedes Benz might be taken to suggest that the Attorney General could use admiralty procedures to seize property even without probable cause.  See 711 F.2d at 1302. Other courts held that probable cause must be present in all cases, regardless of the procedure, as a matter of constitutional law.  See United States v. Daccarett, 6 F.3d 37, 49-50 (2d Cir. 1993).  If One 1978 Mercedes Benz did not require probable cause for the seizure, it is unclear whether the case would still be a correct statement of the law, as both the civil forfeiture statutes and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims have since been amended to afford greater procedural protections.  See 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3222 (2d ed. 1997) (discussing amendments to admiralty warrant rules). Compare 18 U.S.C. § 981(b)(2) (1994) with id. (2000).  For present purposes, the important point is simply that pretrial seizure in civil forfeiture cases has traditionally been available upon a relatively low showing by the government.

[8]  The purposes behind CAFRA are also recounted in two committee reports that discuss previous versions of the bill. See H.R. REP. NO. 106-192 (1999); H.R. REP. NO. 105-358 (1997). Neither report discusses the precise provision at issue here, as it was added as part of an amendment on the Senate floor.

the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).
CAFRA also added § 983(j), which authorizes pretrial restraining
orders and other measures to preserve property pending resolution
of the case. The particular provision at issue in this appeal is
§ 983(j)(1)(A), which concerns post-complaint restraining orders.

As we observed above, § 983(j)(1)(A) does not mention a
hearing, let alone fix the standard of proof in such a hearing.
When due process requires a hearing, as both sides agree that it
sometimes does, we think that the standard of proof applied at
such a hearing should likewise be a function of what due process
requires. In deciding what due process requires, we find
compelling guidance in the Supreme Court's decision in Monsanto,
which involved 21 U.S.C. § 853(e)(1)(A). In that case, like the
case before us today, the government had obtained a pretrial
restraining order that froze assets that the government contended
were subject to forfeiture. The owner objected that the assets
were necessary to pay for an attorney to defend him on the
related criminal charges. The court of appeals had originally
held that, although funds needed to pay for an attorney were
subject to forfeiture and pretrial restraint, due process
required a post-restraint, pretrial hearing at which the
government would be required to show a likelihood of succeeding
in the criminal forfeiture case. United States v. Monsanto, 836
F.2d 74, 83-84 & n.9 (2d Cir. 1987). On rehearing, the en banc
court went further and held that funds needed to pay for a

19

criminal defense attorney were not subject to forfeiture or pretrial restraint at all. United States v. Monsanto, 852 F.2d 1400, 1402 (2d Cir. 1988) (en banc). The Supreme Court reversed, holding that funds needed to pay for a criminal defense were not exempt from forfeiture and that such assets could properly be restrained under § 853(e)(1)(A) pending trial "based on a finding of probable cause to believe that the assets are forfeitable." 491 U.S. at 615 (emphasis added). The Court supported its decision by noting that its precedents required the government to make only a showing of probable cause before physically seizing property alleged to be subject to forfeiture, a more severe form of interference than a restraining order. Id. Moreover, the Court pointed out that the government may restrain a person (i.e., arrest him or her) based on a finding of probable cause. Id. at 615-16. The Court concluded by observing that "if the Government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial." Id. at 616. It is true that Monsanto arose in connection with a criminal forfeiture proceeding, but we see no reason why due process should require a different standard of proof when the assets

20

needed to pay an attorney to provide a criminal defense are restrained as part of a related civil forfeiture proceeding.[9]

The recent passage of CAFRA does not mean that we should now require more than what <u>Monsanto</u> required. CAFRA raised the government's ultimate burden of proof on the merits in a civil forfeiture case from probable cause (subject to rebuttal by a preponderance) to a preponderance of the evidence. But it is important to remember that since <u>Monsanto</u> was a criminal forfeiture case under 21 U.S.C. § 853(a), the government's ultimate burden on the merits was to prove the crime beyond a reasonable doubt and prove the forfeitability of the property by a preponderance of the evidence.[10] Given that ultimate standard

---

[9] This is not to deny that there are important differences between the civil and criminal contexts, including differences that might bear on the circumstances in which due process requires a speedy post-restraint hearing. In the criminal context, an ex parte pretrial restraining order under 21 U.S.C. § 853(e)(1)(A) is at least supported by a grand jury finding of probable cause, but that need not be the case in civil forfeitures. Moreover, the ultimate resolution of a civil forfeiture case may be longer in coming, as such a case is not governed by the speedy trial considerations operative in a criminal case. While a claimant in a civil forfeiture case might hope to regain restrained property quickly by filing a motion for summary judgment, the government can block this tactic by moving to stay the civil forfeiture proceeding pending the criminal trial. <u>See</u> 18 U.S.C § 981(g)(1) (2000); <u>Michelle's Lounge</u>, 39 F.3d at 699-700. These differences might bear on the need for a post-restraint hearing, but the differences do not seem to us to affect <u>Monsanto</u>'s resolution of the standard of proof to be applied at such a hearing.

[10] That appears to be the view embraced by most courts at around the time of the Supreme Court's decision. <u>See, e.g.</u>, <u>United States v. Elgersma</u>, 971 F.2d 690 (11th Cir. 1992) (en banc); <u>United States v. Hernandez-Escarsega</u>, 886 F.2d 1560, 1576-

21

of proof, Monsanto held that the pretrial restraining order could continue in effect based on a showing of probable cause. With the passage of CAFRA, the ultimate standard on the merits in civil cases has been raised, but it has not been raised beyond the ultimate standard that was applicable in Monsanto, a criminal case. That CAFRA raised the merits standard in civil cases is therefore no reason to go beyond what Monsanto required at the pretrial stage.

While Monsanto is the primary basis for our decision, we note as well that employing the probable cause standard in the context of § 983(j)(1)(A) has the additional virtue of aligning with the standard for obtaining the alternative device for preserving assets subject to forfeiture: outright seizure. Property subject to forfeiture can in many cases be seized by the government, pending trial, upon no more than an initial showing of probable cause. See 18 U.S.C. §§ 981(b)(2), 985(d) (2000). When the seizure is later challenged in a due process hearing, the standard has likewise been held to be probable cause. See Farmer, 274 F.3d at 805; Michelle's Lounge, 39 F.3d at 700-01. Both Congress and the Constitution see pretrial restraining

_____

77 (9th Cir. 1989); United States v. Sandini, 816 F.2d 869, 874-76 (3d Cir. 1987). But see Monsanto, 852 F.2d at 1412 & n.1 (Mahoney, J., dissenting) (stating that the majority of courts held that forfeitability must be shown beyond a reasonable doubt). Whether the standard for criminal forfeiture was beyond a reasonable doubt or a preponderance of the evidence, the important point is that CAFRA does not require a higher showing on the merits than was required in Monsanto.

orders as preferable, somewhat less restrictive alternatives to outright seizure. See § 985(d)(2); James Daniel Good Real Prop., 510 U.S. at 58-59, 62. It would frustrate that preference were the government able to seize property more easily than it could restrain it.

Against these considerations, White presses our decision in Thier. Some aspects of Thier appear to be in tension with Monsanto, and future cases may need to consider whether certain portions of Thier were overruled. Today's case, however, only requires that we decide the relatively narrow question whether continuing a pretrial restraining order under § 983(j)(1)(A) demands a government showing of probable cause or instead a (presumably somewhat higher) showing of a substantial likelihood of success on the merits. Thier held, in a case involving a separate but textually very similar statute, that the government should be required to make the latter showing, as that is the showing typically required for preliminary injunctions. The opinion in Thier was ostensibly based on an interpretation of the statute itself, not on due process directly, but the opinion nonetheless makes clear that the court's interpretation of the statute was guided by the need to make the statute comport with due process. 801 F.2d at 1468. The Supreme Court, however, did reach the constitutional question in Monsanto, and there the Court concluded that due process permitted the government to restrain assets needed to pay counsel upon a showing of probable

23

cause.  491 U.S. at 615-16.  Whether or not all of <u>Thier</u> remains good law in the context of 21 U.S.C. § 853(e)(1)(A),[11] this new guidance from the Supreme Court convinces us that in the context of § 983(j)(1)(A)——a statute enacted after <u>Monsanto</u>——<u>Thier</u> should not be carried over to the extent that it would require the government to show more than probable cause in order to restrain assets.  On that particular question, we find the Supreme Court's decision in <u>Monsanto</u> controlling.[12]  Accordingly, we hold that probable cause is the proper standard of proof.

**B.  Application of the Standard**

The forfeiture complaint named the following property: three parcels of real property in the Melrose East Subdivision in East Baton Rouge Parish ("the Melrose lots"), two parcels of real

---

[11]    In the wake of the Supreme Court's decision, several courts have rejected or questioned pre-<u>Monsanto</u> rulings that required a showing beyond probable cause in the context of 21 U.S.C. § 853(e)(1)(A).  <u>See</u> <u>Michelle's Lounge</u>, 39 F.3d at 695-96 & n.9; <u>Monsanto</u>, 924 F.2d at 1195.  The Ninth Circuit, which early on had adopted a view similar to that expressed in <u>Thier</u>, has in the wake of <u>Monsanto</u> reaffirmed its earlier cases to the extent that they generally apply Rule 65, but the court appears to require only a showing of probable cause in order to continue a restraining order.  <u>See</u> <u>United States v. Roth</u>, 912 F.2d 1131, 1133-34 (9th Cir. 1990).

[12]    We do not here decide whether other aspects of <u>Thier</u> should be carried over to the context of § 983(j)(1)(A).  In particular, we do not rule on whether the statute incorporates all or any of the procedural protections of Rule 65.  <u>See</u> <u>supra</u> note 4.  As a general matter, the Federal Rules presumptively apply except to the extent that they actually conflict with a subsequent statute.  <u>See</u> <u>Jackson v. Stinnett</u>, 102 F.3d 132, 134-36 (5th Cir. 1996); 1 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 1.06 (3d ed. 2003).

24

property in the Fairwoods subdivision in East Baton Rouge Parish, a parcel of real property in Ascension Parish, a $30,000 USG annuity in the name of one of White's children, a $100,000 American National Insurance Co. annuity in White's name, and a $100,000 USG annuity in White's name.

The government seeks forfeiture of the above property under two separate theories. First, under the proceeds theory, the government contends that the subject property "constitutes or is derived from proceeds" of a "specified unlawful activity," namely health care fraud. See 18 U.S.C. § 981(a)(1)(C) (2000); see also id. § 1956(c)(7)(F) (defining "specified unlawful activity" to include federal health care offenses). Second, under the money laundering theory, the government contends that the property is "involved in" a money laundering offense. See id. § 981(a)(1)(A). Since the proceedings below focused on the proceeds theory, we begin there.

White contends that the government's evidentiary showing was weakest with respect to the Melrose lots. The Melrose lots were purchased with three cashier's checks, totaling $130,000, drawn on DAC's account at Liberty Bank and dated April 6, 1999. From January until some point in April 1999, Unisys had deposited approximately $390,000 of Medicaid funds into the Liberty Bank account. White does not dispute that there is probable cause to believe that some of the billings were fraudulent, nor has he suggested that the funds in the Liberty Bank account came from a

25

source other than DAC's Medicaid billings.[13]  He argues, rather, that the government has not shown that all of DAC's billings in the relevant time period were fraudulent.  And, he continues, if not all of the billings were fraudulent, then the government is not entitled to forfeiture of all of the property traceable to DAC's Medicaid receipts, unless the government shows that the particular funds used to purchase the defendant property are among that portion of DAC's Medicaid receipts that actually are tainted.  In so arguing, White relies on our decision in <u>United States v. One 1980 Rolls Royce</u>, 905 F.2d 89, 90 (5th Cir. 1990), for the proposition that an asset does not become subject to forfeiture in its entirety simply because it was purchased in part with tainted funds.

As we held above, the proper standard for judging the government's showing is probable cause.  Previous forfeiture cases have defined probable cause as "a reasonable ground for belief . . . supported by less than prima facie proof but more than mere suspicion."  <u>1988 Oldsmobile Cutlass Supreme</u>, 983 F.2d at 674 (alteration in original and internal quotation marks omitted).[14]  The probable cause determination in forfeiture cases

---

[13]    Since White does not contend that no fraud occurred, this case does not involve the question whether the district court can "look behind" the grand jury's indictment, which is based on a finding that probable cause exists as to the commission of the indicted fraud offenses.

[14]    This definition of probable cause is typical of the definitions given in our many pre-CAFRA forfeiture cases.  In

26

looks to all of the circumstances and "must be judged . . . with a common sense view to the realities of normal life." <u>United States v. One Gates Learjet</u>, 861 F.2d 868, 870 (5th Cir. 1988) (internal quotation marks omitted).

The government presented persuasive evidence that DAC was engaged in pervasive Medicaid fraud during the months immediately preceding the purchase of the Melrose lots.[15]  The list of local Medicaid recipients that White obtained from Slaton in February 1999 would allow DAC to submit bills for people who had never attended DAC.  Right after White obtained the list, DAC's billings skyrocketed from approximately $25,000 in January 1999 and $39,000 in February 1999 to $163,000 in March 1999, with

those cases, of course, probable cause was the ultimate showing necessary for the government to prevail in a civil forfeiture action, subject to the claimant's rebuttal by a preponderance of the evidence.  Here, by contrast, we are conducting the probable cause inquiry in the distinct context of a pretrial restraining order under § 983(j)(1)(A).  Although it is possible that the phrase "probable cause" could mean something slightly different in this context, we expect that the large body of probable cause law that developed under the pre-CAFRA forfeiture statutes will frequently be useful to courts that are faced with the post-CAFRA task of determining whether certain facts constitute probable cause to continue a pretrial restraining order.  In any event, the definition of probable cause used in our pre-CAFRA law generally comports with the concept of probable cause as it is used elsewhere.  <u>See, e.g.</u>, BLACK'S LAW DICTIONARY 1219 (7th ed. 1999) (defining "probable cause" as, <u>inter alia</u>, "more than a bare suspicion but less than evidence that would justify a conviction").

[15]    Although we refer to the government's "evidence," much of the material relied upon by the government would not be admissible under the Federal Rules of Evidence.  Such material can be considered at a hearing on a pretrial restraining order, however.  <u>See</u> 18 U.S.C. § 983(j)(4) (2000).

27

DAC's billings remaining over $150,000 per month for much of the rest of the year.  (By comparison, DAC had received only $175,000 from Medicaid for all of 1998.)  In other words, DAC's Medicaid receipts for March exceeded the receipts from previous months by roughly the same amount——$130,000——as White used to purchase the Melrose lots on April 6.  Investigators would later interview a sample of thirty-nine of DAC's supposed patients from 1999, billings for whom amounted to approximately $240,000, a sum that is roughly equivalent to a fifth of DAC's total 1999 Medicaid receipts.[16]  Admittedly, the government did not present evidence that traced billings for those patients to particular deposits into DAC's account, and it appears that the thirty-nine people received services at various times in 1999, both before and after the purchase of the Melrose lots.  Still, the pattern of responses from this sample was indicative of widespread fraud. Ten of the thirty-nine had never heard of DAC, and, while most said that they had attended certain programs at DAC, all of them denied receiving the drug treatment services for which DAC billed Medicaid.  Investigators learned that DAC billed Medicaid for services rendered to persons who were in jail or in the hospital at the time that the services were supposedly rendered.  At the

_____

[16]     It is unclear what percentage of DAC's clientele this thirty-nine-person sample represents.  White has at times suggested that DAC served as many as 500 people during the relevant period, though there does not appear to be any record evidence to that effect.  For its part, the government says that DAC served substantially fewer clients, roughly 300.

hearing, there was testimony that investigators spoke to some DAC employees and, at least according to those employees, DAC was not providing the type of individualized addiction counseling for which DAC was billing Medicaid.

Against this, White's evidence was an affidavit from a person who had seen, at an unspecified date, children attending individual and group counseling sessions at DAC. White did not present evidence that the Liberty Bank account contained funds from any source other than Medicaid receipts. His lawyers examined the government's witnesses and attempted to show that the government could not link the receipts attributable to the thirty-nine clients with the funds used to buy the Melrose lots, but White did not present any affirmative evidence that the Melrose lots were purchased with clean funds, if there were any.[17]

---

[17] Although the government contends that the district court ultimately reached the correct conclusion that probable cause existed, the government has strenuously argued that the district court employed an improper procedure, particularly by permitting White to preview the government's criminal case by examining its witnesses. Pretrial discovery in criminal cases is of course much more limited than discovery in civil cases, and so the district court must be careful, when exercising its considerable discretion over pretrial procedural matters, to give proper weight to the government's legitimate interests in protecting certain evidence and witnesses from pretrial exposure. Although the government bears the burden at a pretrial hearing of persuading the court that probable cause exists, we agree with the government that the district court generally should not permit a person in White's position to examine the government's witnesses without first producing some evidence suggesting that the restrained assets were untainted. Cf. Jones, 160 F.3d at 647.

Examining all of the circumstances as a whole, we conclude that the government satisfied its burden, under the probable cause standard, of establishing that the Melrose lots were purchased with funds that constituted the proceeds of Medicaid fraud.  The results of the thirty-nine interviews, combined with the other significant evidence of fraudulent billings, provide a reasonable basis to believe that DAC was not performing any of the services for which it was billing Medicaid during the relevant time period.  While the record does not clearly establish whether some of the funds in the Liberty Bank account might have been left over from a time when DAC was legitimately billing Medicaid, the district court was entitled to draw the inference, as a matter of probable cause, that the purchase of the Melrose lots for $130,000 on April 6, which came on the heels of a spike in Medicaid billings of approximately the same amount, was accomplished with tainted funds.  While we do not express an opinion as to whether the government would ultimately succeed on the merits with this evidence, it is enough to establish probable cause.[18]

---

[18]    We pause to explain why we are not persuaded by White's argument that some of the factual inferences that we have permitted in past forfeiture cases, which involved drug crimes, are not appropriate in the case of a fraudulent business scheme. If there is a basis to believe that a person has no source of income other than selling illicit drugs, then we can often presume, because drug dealing is illegal, that all of the drug dealer's significant purchases are accomplished with tainted funds and are therefore subject to forfeiture.  When drug-dealing is apparently the only source of income, our cases have therefore

White has focused his arguments on appeal on the Melrose lots and does not make any contentions specific to any of the remaining restrained properties. As discussed above, his general argument regarding all of the restrained assets is that the government has not shown with any particularity that the specific funds used to purchase the assets were tainted. Aside from the Melrose lots and the $30,000 USG annuity, all of the restrained property was purchased from July to December 1999 with funds traceable to Medicaid deposits into DAC's account at Dryades Bank.[19] Apart from the initial $5000 used to open that account,

relieved the government of the burden of demonstrating a connection between the money used to buy a particular item and a particular drug transaction; we instead have required the drug dealer to point to a non-drug source for the funds used in the purchase. See, e.g., United States v. One 1987 Mercedes 560 SEL, 919 F.2d 327, 331 (5th Cir. 1990); see also 21 U.S.C. § 853(d) (2000) (creating a similar presumption in criminal drug forfeiture cases). White argues that such inferences are inappropriate in his case, as operating a drug treatment business is not inherently illegal, and thus even when some fraud is occurring, there can be lawful receipts mixed in. The government, in his view, should therefore be required to show in a more particularized way that the restrained properties were purchased with receipts that actually are tainted. In its strongest form, the argument asks us to limit the restraining order to assets that can be shown to have been purchased with funds traceable to the thirty-nine interviewees. The flaw in White's argument is that the government has established probable cause, based upon persuasive circumstantial evidence, to believe that all of DAC's receipts during the relevant period were fraudulent. And there is also probable cause to connect the restrained assets to those same receipts. Therefore, while White's argument may have some truth to it as a general matter, it is no help in this case.

[19] The $30,000 USG annuity was apparently purchased with a kickback check from Dana White of HLS.

31

all of the money in the Dryades Bank account came from Medicaid deposits, which began flowing into the account in April 1999, when DAC switched banks.  Since we concluded above that there was a sufficient basis to conclude that all of DAC's billings during this time frame were fraudulent, there is probable cause to continue to restrain these properties, which are derived from the billings.

Because we conclude that the government made a sufficient showing to justify the restraint of White's assets under the proceeds theory, which was the focus of the proceedings below, we need not discuss the money laundering theory.

## IV. CONCLUSION

For the foregoing reasons, the district court's denial of White's motion to modify the pretrial restraining order is AFFIRMED.