United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 4, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 04-11282

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HOLY LAND FOUNDATION
FOR RELIEF AND DEVELOPMENT, ETC. ET AL,

Defendants,

DAVID J. STRACHMAN, in his capacity as administrator of
the Estate of Yaron Ungar; DVIR UNGAR; YISHAI UNGAR;
JUDITH UNGAR; MEIR UNGAR; MICHAL COHEN;
AMICHAI UNGAR; DAFNA UNGAR,

Appellants.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before BENAVIDES, STEWART, and OWEN, Circuit Judges.

CARL E. STEWART, Circuit Judge:

David J. Strachman, in his capacity as administrator of the Estate of Yaron Ungar; Dvir

Ungar; Yishai Ungar; Judith Ungar; Meir Ungar; Michal Cohen; Amichai Ungar; and  Dafna Ungar,

challenges a Texas federal district court's restraining order that indefinitely freezes specific bank accounts that allegedly had been levied pursuant to writs of execution, issued by New York, South Carolina, and Washington federal district courts, in order to satisfy a judgment the appellants obtained against assets of the Holy Land Foundation For Relief and Development. The allegedly levied bank accounts are only some of the assets specified in, or otherwise covered by, the restraining order. Additionally, Strachman urges this court to grant a Motion for Summary Disposition and Vacatur obviating our consideration of the merits of the appeal. For the following reasons, we deny the Motion for Summary Disposition, and vacate and remand to the district court for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

A forty-two count indictment, filed July 26, 2004, charged Holy Land Foundation for Relief and Development ("HLF") with material support of a terrorist organization, tax evasion, and money laundering and sought forfeiture of HLF property. The Government obtained an ex parte restraining order, on September 24, 2004, from the District Court for the Northern District of Texas in order to preserve HLF's assets for the forfeiture requested in the indictment. The restraining order indefinitely freezes the assets of HLF and its financial agents.

Appellant David Strachman represents the estates of husband and wife, Yaron and Efrat Ungar, who were killed during a terrorist attack. In February 2004, Strachman, along with members of the Ungar family and their representatives, ("the Ungars") obtained a $116,409,123 default judgment against Hamas[1] in Rhode Island's federal district court pursuant to the civil provisions of

---

[1] According to the indictment against HLF, "The Harakat al-Muqawama al-Islamiyya is Arabic for 'The Islamic Resistance Movement' and is known by the acronym HAMAS. HAMAS, which is sometimes referred to by its followers as 'The Movement,' is a terrorist organization based in the

the Antiterrorism Act of 1991, 18 U.S.C. § 2333.[2] *See Estates of Ungar ex. rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238, 242 (D.R.I. 2004). The Rhode Island federal district court determined that its judgment was enforceable against the assets of HLF. *Id.* at 241. Based on this judgment, federal district courts in New York, South Carolina, and Washington issued writs of execution against HLF that the Ungars allege were levied in the respective jurisdictions on or before September 13, 2004.

The Ungars appeal the restraining order against HLF, requesting that it be vacated, that the district court be directed to refrain from entering further orders that restrain the property and, in the alternative, that this court direct the district court to conduct a hearing and provide the Ungars an opportunity to brief and argue these issues.

## II. STANDARD OF REVIEW

Although we review a district court's order of injunction for abuse of discretion, where the district court's decision to grant a motion for injunction turns on the application of statutes or procedural rules, our review of that interpretation is de novo. *Cf. Castillo v. Cameron County, Tex.*, 238 F.3d 339, 347 (5th Cir. 2001) ("Although the district court's decision to continue the injunctions is to be reviewed for an abuse of discretion, because the district court's decision to terminate or continue the injunctions turns on the application of § 3626(b) of the [Prison Litigation Reform Act of 1995], that interpretation is reviewed de novo." (citations omitted)).

---

West Bank and Gaza Strip."

[2] Enacted as part of the Antiterrorism Act of 1991 ("ATA"), 18 U.S.C. § 2333 provides a cause of action for American nationals injured in their person, property, or business by reason of an act of international terrorism. *Estates of Ungar ex. rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232 (D.R.I. 2004).

III. DISCUSSION

A. Overview

The assets at issue are the funds in certain "blocked" HLF bank accounts located in New York, South Carolina, and Washington that were specified, by state and account number, in the Texas district court's restraining order.[3] The Ungars assert that, before the Texas district court entered this restraining order on September 24, 2004, they had levied writs of execution on these funds pursuant to judgments obtained in New York, South Carolina, and Washington federal district courts. According to the Ungars, this placed these funds in the possession of those courts and thereby divested the Texas district court of jurisdiction to enter this restraining order.

The Ungars appeal, contending that this court should vacate the restraining order because the Texas district court was without jurisdiction to enter it, and/or because the attachment provision of the Terrorism Risk Insurance Act of 2002 ("TRIA") section 201(a), 28 U.S.C. § 1610(f)(1)(A) (2000), overrides criminal forfeiture provisions. The Ungars further contend that they are entitled to have this ex parte restraining order vacated because it was directed toward them yet, in violation of their Fifth Amendment due process rights, they were given no notice or hearing. Accordingly, we must determine (1) whether the Texas district court had jurisdiction to enter this order restraining funds that were subject to a levied writ of execution issued by a federal district court in each of three

---

[3] In *Estates of Ungar ex rel. Strachman*, 304 F. Supp. 2d at 241, the court explained the blocking as follows:

> On December 4, 2001, the Office of Foreign Asset Control ["OFAC"], a division of the Treasury Department, determined that the HLF acts "for or on behalf of" Hamas and was thus a Specially Designated Terrorist under Executive Order 12947 and a Specially Designated Global Terrorist under Executive Order 13224. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 64 (D. D.C. 2002). These designations allowed the Treasury Department to block all of the HLF's funds, accounts, and real property. *Id.*

other states and, if so, whether the provisions of TRIA supercede the criminal forfeiture provisions attendant to this § 853(e)(1)(A) order; and (2) whether the Federal Rule of Civil Procedure 65 notice provisions apply to this 21 U.S.C. § 853(e)(1)(A) restraining order and, if so, whether the Ungars possess the Fifth Amendment rights they claim were violated by the absence of notice and hearing.

In addition to their appeal, however, the Ungars filed a Motion for Summary Disposition and Vacatur asking this court *not* to reach the merits of their appeal and, instead, to summarily render judgment in their favor because this ex parte restraining order had expired on its face and did not comply with Federal Rule of Civil Procedure 65 hearing and notice requirements. The motion also requests that this court direct the district court to provide the Ungars an opportunity to be heard and to present their arguments in opposition, if the Government seeks a new restraining order.

The Government opposes summary disposition and contends that the Ungars lack standing to appeal the restraining order. The Government also argues that this case does not meet the standard for summary disposition.

Prior to reaching the merits, we first address the Ungars' standing to appeal the restraining order, then examine whether this case is appropriate for summary disposition.

B. The Ungars' Standing to Appeal

The Ungars assert that they have standing to appeal the restraining order because it affects their interests. The Ungars also argue that they are the main targets of the restraining order, yet they have had no opportunity to oppose, contest, or be heard. The Ungars contend that their interests are perfectly aligned against the interests of the defendant and the Government, therefore neither party will raise and protect their rights if they are not permitted to do so themselves.

By contrast, the Government argues that the Ungars are statutorily barred from asserting HLF's rights in a forfeiture proceeding. The Government asserts that third parties may participate in forfeiture proceedings only (1) in hearings concerning post-indictment restraint on forfeitable property where they can assert their own due process claims or claims of irreparable injury, and (2) in post-conviction ancillary proceedings, where they can assert their interest in the forfeitable property.

"[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Flast v. Cohen*, 392 U.S. 83, 99-100 (1968). The three requirements that constitute the "irreducible constitutional minimum" of standing are "injury in fact," causation, and redressability. *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citations omitted). The first, "injury in fact," requires that the appellant show personal harm that is concrete, distinct and palpable, as well as actual or imminent. *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990). To satisfy the second requirement, the appellant "must establish a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 225 (2003) (internal quotation marks, alterations, and citation omitted). The third requirement, redressability, is present if there is a "substantial likelihood that the requested relief will remedy the alleged injury in fact." *Id.* (internal quotation marks omitted, citing *Stevens,* 529 U.S. at 771); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982) ("[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that

6

the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." (citations and internal quotation marks omitted)). "The [appellant] must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore*, 495 U.S. at 155-56.

"While there is a general rule that non-parties to a suit do not have standing to appeal, we have previously stated that exceptions exist. For instance, in *Castillo*[,] . . . we reaffirmed the principle that if the decree affects a third party's interests, he is often allowed to appeal." *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 329 (5th Cir. 2001) (citation and internal quotation marks omitted). If an injunction extends to non-parties, they may appeal from it. *United States v. Chagra*, 701 F.2d 354, 359 (5th Cir. 1983).

The indictment's forfeiture count asserts the Government's interest in these blocked assets. The indictment and the Government's application for the restraining order each detail the fact that the HLF property is blocked to all except OFAC and third parties like the Ungars. The purpose of the restraining order was to keep OFAC, the Ungars, and others like the Ungars, from interfering with the Government's interest in these assets. Moreover, the Ungars are specifically mentioned in the Government's Application for Post-indictment Restraining Order, and the restraining order includes a list of, inter alia, the same assets the Ungars claim to have levied in partial satisfaction of their judgment against Hamas. The order of injunction restrains "persons, financial institutions, or other entities who have any interest or control over the subject property." If the Ungars are persons who have any interest or control over the property at issue, then the restraining order is directed toward them. The Ungars allege that they have "a personal stake in the outcome of the controversy,"

and argue that the dispute at bar "touches upon the legal relations of parties having adverse legal interests." *Flast*, 392 U.S. at 101 (citations and internal quotation marks omitted). Having purportedly levied writs of execution issued by federal district courts against some of the HLF assets expressly named in this restraining order, the Ungars appear to have an interest in, and arguably may have some control over, these assets.

It is true that the Ungars did not participate in the proceedings before the Texas district court.[4] Nevertheless, on the face of the injunction and the pleadings that gave rise thereto, it appears that the injunction seeks to keep the Ungars from obtaining specific assets that are the subject of federal writs of execution that the Ungars claim to have levied. Under this scenario, we find that the Ungars have standing to appeal this restraining order.

C. Motion for Summary Disposition and Vacatur

The Ungars' Motion for Summary Disposition and Vacatur asserts that the restraining order has expired and is "facially void under Rule 65" and that, therefore, summary disposition is appropriate. The Government opposes summary disposition and contends that this case is not appropriate for summary disposition.

Summary disposition is proper "[in] those cases where time is truly of the essence," or where "the position of one of the parties is clearly right as a matter of law so that there can be no substantial question as to the outcome of the case." *Groendyke Transp., Inc. v. Davis*, 406 F.2d 1158, 1162 (5th Cir. 1969). Summary disposition also may be appropriate in other situations, such as when the

---

[4] Pursuant to 28 U.S.C. § 1292(a)(1), we have jurisdiction over an appeal from the district court's interlocutory order that granted the injunction. Although the Ungars could have asked the district court to vacate its order, § 1292 imposes no jurisdictional requirement that they do so.

grounds for an order granting or dissolving an injunction no longer exist. *See Aerojet-Gen. Corp. v. Askew*, 476 F.2d 184, 186 (5th Cir. 1973).[5]

Despite the Ungars' assertion, the instant restraining order is not facially void. The order states that it "shall remain in full force and effect until further order of this Court," and thus it has not expired on its face. Accordingly, we do not summarily vacate the injunction on that basis.

Relying on *United States v. Thier*, 801 F.2d 1463, 1468 (5th Cir. 1986), the Ungars also argue that this 21 U.S.C. § 853(e)(1)(A) restraining order should be summarily vacated because it is the equivalent of an ex parte temporary restraining order that was not issued in compliance with Federal Rule of Civil Procedure 65. It is true that this restraining order was issued pursuant to 21 U.S.C. § 853(e)(1)(A) in order to protect the Government's interest in assets alleged to be subject to criminal forfeiture. It is also true that, under *Their*, Federal Rule of Civil Procedure 65 notice and hearing requirements for ex parte orders apply to § 853(e)(1)(A) restraining orders. Yet, as discussed infra in Part III.F.2., *Their* has been overruled, albeit on grounds other than its holding that Federal Rule of Civil Procedure 65 governs § 853(e)(1)(A) restraining orders, and a panel of this court has questioned whether Rule 65 still governs § 853(e)(1)(A) restraining orders. Accordingly, we find that the merits of the opposing positions at bar are not so clear as to warrant summary disposition, and we deny the Ungars' request that we summarily dispose of this appeal without reaching its merits.

D. Jurisdiction of the Texas District Court to Enter the Restraining Order

---

[5] In *Aerojet*, the United States District Court for the Northern District of Florida dissolved an injunction specifically to encourage instigation of a state court suit to quiet title, and Aerojet appealed the dissolution order. *Aerojet*, 476 F.2d at 186. In a related state court suit to quiet title, Aerojet sought and obtained removal to the District Court for the Southern District of Florida. *Id*. at 185-186. As to Aerojet's appeal of the order dissolving the injunction, this court found that it would be a waste of money and judicial energies to allow full briefing and argument because the "express grounds for the district court's (Northern District) order have now evaporated." *Id*. at 186.

9

1. *Overview of Jurisdictional Issue*

On September 24, 2004, the Texas district court ordered that "persons, financial institutions, or other entities who have any interest or control over the subject property are hereby restrained, enjoined and prohibited . . . from . . . distributing" any of the HLF funds listed in Attachment A to the Government's application for the restraining order. Prior to September 24, 2004, funds in some of the accounts listed in Attachment A were levied pursuant to a writ of execution issued by a federal district court in each of the following states: New York, South Carolina, and Washington.

Citing *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1188 (5th Cir. 1978), the Ungars contend that these accounts were withdrawn from the jurisdiction of all other courts because the levied writs of execution placed them *in custodia legis*.[6] The Ungars contend that other courts of competent jurisdiction had already taken possession of the bank accounts, therefore, the Texas district court had no jurisdiction to issue an order restraining transfer or other disposition of these HLF funds.

By contrast, the Government contends that property is placed *in custodia legis* only via an in rem judgment. According to the Government, the Ungars' action and judgment against Hamas was in personam, and registration of this in personam judgment in other federal district courts did not convert their action into an in rem proceeding. The Government asserts that because there was no in rem proceeding before them, the courts that issued writs of execution did not have exclusive jurisdiction over HLF assets and, therefore, the Texas district court had jurisdiction to enter the restraining order.

2. *Applicable Law*

---

[6] *In custodia legis* means "[i]n the custody or keeping of the law." *Black's Law Dictionary*, 691 (5th ed. 1979); *see also In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005) (explaining that *in custodia legis* means "literally, 'in the custody of the law'; loosely, 'in the care of the court'").

The procedure and proceedings on, and in aid of, a judgment or execution thereof "shall be in accordance with the practice and procedure of the state in which the district court is held . . . except that any statute of the United States governs to the extent that it is applicable." Fed. R. Civ. P. 69(a). In the instant context, to "levy" is "[t]o take or seize property in execution of a judgment"; to "garnish" is "to attach (property held by a third party) in order to satisfy a debt"; and to "attach" is "[t]o take or seize under legal authority. *Black's Law Dictionary*, 927, 702, 136 (8th ed.2004). A garnishee is "a person or institution (such as a bank) that is indebted to or is bailee for another whose property has been subjected to garnishment." *Black's Law Dictionary*, 691 (5th ed. 1979); *see also* N.Y.C.P.L.R. § 105 (i) (McKinney 1997) ("A 'garnishee' is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest.").

The Ungars are judgment creditors, having obtained a judgment against HLF's assets. Each financial institution served with a writ of execution is a garnishee, a holder of property in which the judgment debtor, HLF, has an interest. The writs of execution contain the following language:

> YOU ARE COMMANDED, that of the goods, chattels and other assets of HAMAS . . . in your district, you cause to be made the total sum of [$116,409,123.00] which lately in the United States District Court for the District of Rhode Island, [the Ungars] recovered against HAMAS . . . , in an action between [the Ungars and Hamas], and said judgment was entered on February 11, 2004, in favor of [the Ungars] and registered on [6/1/2004 in S.D., N.Y.; 7/29/2004 in W.D., Wa.; 8/24/2004 in D., S.C.] . . . .
>
> Pursuant to § 201 of the Terrorism Risk Insurance Act of 2002 . . . this Writ shall also be effective to execute upon the goods, chattels and other assets of The Holy Land Foundation . . . ("HLF") in satisfaction of [the Ungars'] judgment against [Hamas], and the phrase, "goods, chattels and other assets of HAMAS . . ." appearing herein shall therefore also include goods, chattels and other assets of the HLF.

11

Each levy specifies the HLF account(s) and purports to be signed by a United States Marshal or deputy. The Washington levy shows personal service upon the financial institution on September 3, 2004, and the South Carolina levy shows personal service on September 14, 2004. The New York levy indicates that it was served upon a financial institution, but the date of service is illegible and there is no indication of whether the service was personal or otherwise.

New York, South Carolina, and Washington have similar yet distinct means of handling execution of the Ungars' judgment by levying upon HLF bank accounts. Our review of the record reveals that none of the levies was perfected so as to transfer possession or control of HLF's interest in the bank accounts to the respective federal district courts or to the Ungars in such a manner that the Ungars may now challenge the Texas district court's jurisdiction to enter the restraining order.

2. *The New York Levy*

In New York, levy of a writ of execution upon a bank account is accomplished by the service of the proper documents upon the bank by the sheriff. N.Y.C.P.L.R.§ 5232 (McKinney 1997). Once this is done, the levy is valid for ninety days. *Id*.

> At the expiration of ninety days after a levy is made by service of the execution, or of such further time as the court, upon motion of the judgment creditor or support collection unit has provided, the levy shall be void except as to property or debts which have been transferred or paid to the sheriff or to the support collection unit or § as to which a proceeding under sections 5225 or 5227 has been brought.

*Id.*; *see also Lennox v. Brady*, 101 N.Y.S. 2d 22, 24 (N.Y. Sup. Ct. 1950) (stating that "a levy is rendered void where the property levied upon under a warrant of attachment is not reduced to actual possession" or turnover proceedings instituted, within the ninety day period). The record does not indicate that, (1) during the ninety days after levy upon the New York bank account, HLF property was transferred into the possession or control of the sheriff; or (2) the Ungars perfected the levy by

12

commencing a turnover proceeding directed against the holder of the property. If either is not done within the ninety day period, the levy is void. *See generally* N.Y.C.P.L.R.§§ 5232, 5225, 5227 (McKinney 1997); *Wordie v. Chase Manhattan Bank*, 529 N.Y.S.2d 1,1 (N.Y. App. Div. 1988).

The Ungars assert that service of the proper documents upon the New York banks occurred on September 2, 2004. Assuming arguendo that this is true, the record reflects no transfer of the funds from the banks to the United States Marshal or sheriff, and no acknowledgment or other indication by the banks that the United States Marshal or sheriff has control of HLF's interest in the accounts. Likewise, the record reflects no commencement of turnover proceedings.[7] Accordingly, the levy became void on or about December 2, 2004. Although it is arguable whether the New York levy divested the Texas district court of jurisdiction to enter the restraining order as to the funds in New York accounts, it is undisputed that the New York levy is void. "It is well-settled that no recovery may be had for losses which the purportedly injured party might have prevented by reasonable efforts and expenditures." *Wordie*, 140 A.D. 2d at 436, 529 N.Y.S. 2d at 2 (citation omitted). The Ungars allowed the New York levy to lapse and become void by failing to pursue, within the prescribed ninety day period, the statutory mechanisms available to perfect the levy. *Cf. id*.; *but see In re Flax*, 179 B.R. 408 (E.D. N.Y. 1995) ("New York courts have not held the Sheriff's failure to obtain possession of the property to be seized fatal to the lienor's interest in every case, but the courts have made an exception only where the failure is caused by a third party's failure to comply with the

_____

[7] Although not a part of the instant record, the docket of the District Court for the Southern District of New York reveals that, on April 11, 2005, the Ungars instituted turnover proceedings against the New York banks, pursuant to sections 5225 or 5227 of the New York Civil Practice Law and Rules –well after the date in early December 2004 when the levy became void.

13

Sheriff's directives to turn over the property."). There being no valid New York levy, we decline to grant relief to the Ungars based upon a levy allowed to become void by their inaction.

3. *The South Carolina Levy*

In South Carolina, a judgment creditor executes upon personal property of the judgment debtor via attachment. S. C. Code Ann. § 15-19-10 (1976). Personal property is bound for four months from the date of levy. S. C. Code Ann. § 15-39-100 (1979). As in New York, a South Carolina bank may comply with the levy and give possession to the sheriff upon levy, but there must be a separate garnishment action against the bank in order to make a levy effective if the bank does not give the sheriff possession or control. *See Johnson v. Serv. Mgmt. Inc.*, 478 S.E.2d 63 (S.C. 1996); *Johnson v. Serv. Mgmt. Inc.*, 459 S.E.2d 900 (S.C. Ct. App.1995), *aff'd*, 478 S.E.2d 63 (S.C. 1996). There is no valid levy until the sheriff has either possession or the power to possess or control. *McManus v. Bank of Greenwood*, 171 S.E. 473 (S.C. 1933).

The instant record contains no indication that the South Carolina bank gave possession or control of the bank account (or HLF's interest therein) to the United States Marshal or sheriff, and no indication the Ungars commenced the requisite action to make the levy effective. Accordingly, the Ungars have not shown that the South Carolina levy divested the Texas district court of jurisdiction to restrain the funds in HLF's South Carolina bank accounts.

4. *The Washington Levy*

Under Washington state law, when a judgment creditor seeks to obtain a judgment debtor's property from a bank as garnishee, there must be a specific proceeding in which a writ of garnishment is directed to the bank. Wash. Rev. Cod. Ann. §§ 6.27.20 - 6.27.370 *passim* (West 1995); *see also Yakima Adjustment Serv., Inc. v. Durand*, 622 P.2d 408, 412 (Wash. Ct. App. 1981) ("[U]pon being

14

served with a writ of garnishment the garnishee must answer and disclose what funds, if any, he holds that are due or owing to a defendant. He must serve the answer on a defendant, [Wash. Rev. Cod. §§ 6.27.110, 6.27.190], who may thereafter controvert it by way of affidavit. The issue is thus formed and the matter then tried.").

While a garnishment is an in rem proceeding that places property *in custodia legis*, the garnishment provisions are separate and distinct from the provisions for writ of execution and levy. *U. S. Fid. & Guar. Co. v. Hollenshead*, 98 P 749, 750 (Wash. 1909). *Compare* Wash. Rev. Cod. Ann. § 6.17.160(7) (West 1995) ("Other intangible personal property may be levied on by serving a copy of the writ on, or mailing it to, the judgment debtor in the manner as required by RCW 6.17.130, together with a description of the property."); Wash. Rev. Cod. Ann. § 6.27.080 (West 1995) ("A writ of garnishment is effective against property in the possession or control of a financial institution only if the writ of garnishment is directed to and names a branch as garnishee defendant."). Thus, the Ungars' Washington levy could have been valid *if* it were in execution of a judgment rendered in a garnishment proceeding. Nothing in the record shows that the Ungars served a writ of garnishment upon the Washington bank. The record reveals nothing about garnishment proceeding, or a judgment (or execution/levy thereof) that resulted from such a proceeding. Accordingly, there appears to have been no bar to the Texas district court's jurisdiction to enter the restraining order as to the HLF bank accounts in Washington.

5. *Summary of Jurisdictional Analysis*

Neither the South Carolina nor the Washington levy placed HLF funds in the custody of a court or its officer so as to remove the funds from the jurisdiction of the Texas district court. The New York levy arguably divested other courts of jurisdiction during the ninety day period following

15

service, but that levy is void and therefore is not a proper basis for the relief requested by the Ungars. Under these circumstances, the Ungars have not demonstrated that the Texas district court was without jurisdiction to include the HLF bank accounts in South Carolina or Washington in its order restraining HLF assets. Moreover, the Ungars may not challenge entry of this restraining order on the basis of a levy they allowed to become void. For these reasons, the Ungars' jurisdictional argument fails.

E. The Terrorism Risk Insurance Act of 2002 § 201(a) and 21 U.S.C. § 853

The Ungars next argue that the Terrorism Risk Insurance Act of 2002 ("TRIA") section 201(a), 28 U.S.C. § 1610(f)(1)(A) (2000), permits attachments and executions "notwithstanding any other provision of law," and that the legislative purpose of the TRIA is such that § 1610(f)(1)(A) trumps any forfeiture provisions and proceedings. Thus, they contend, § 1610(f)(1)(A) overrides statutory limitations on attachment and execution, and all blocked HLF assets are subject to execution under § 1610(f)(1)(A), without regard to whether they are tainted property otherwise subject to restraint or criminal forfeiture. The basis for this argument is the § 1610(f)(1)(A) provision that, "notwithstanding any other provision of law, . . ." blocked assets (such as the restrained HLF bank accounts) "shall be subject to execution or attachment in aid of execution of any judgment relating to a claim" such as the claim upon which the Ungars prevailed against Hamas.[8] 28 U.S.C. § 1610(f)(1)(A) (2000); *Estates of Ungar ex rel. Strachman*, 304 F. Supp. 2d at 241-42.

The Government counters this argument by pointing out that, as third parties rather than owners of the restrained assets, the Ungars may not assert HLF's rights. The Government asserts that

---

[8] The Ungars and the Government agree that the Ungars' judgment against Hamas, the nature of HLF's blocked assets, and the related New York, South Carolina, and Washington federal district court judgments are within the scope of § 1610(f)(1)(A).

16

ancillary proceedings under the criminal forfeiture statute are the exclusive means by which third parties may assert their interest in forfeitable property, and contends that the Ungars may not assert their alleged interest in HLF's forfeitable property prior to entry of an order of forfeiture. This contention is grounded in 21 U.S.C. § 853 which provides that (1) "[n]o party claiming an interest in property subject to forfeiture under this section may intervene in a trial or appeal of a criminal case involving the forfeiture," or "commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section," except as provided in § 853(n); and (2) after entry of an order of forfeiture, a third party may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. §§ 853(k), 853(n)(2).

The Ungars are not parties to the instant criminal case; they have appealed but have not commenced an action against the United States. Likewise, they have not intervened in the criminal case against HLF. *See* Fed. R. Civ. P. 24(c) ("A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought."). Accordingly, their appeal is outside the scope of §§ 853(k) and 853(n)(2). While § 853(n)(2) permits a third party to petition the court after entry of a forfeiture order, § 853 does not require entry of a forfeiture order before third parties in the Ungars' procedural posture may challenge an ex parte, post-indictment restraining order that specifies bank accounts subject to writs of execution issued by other federal district courts. Similarly, § 1610(f)(1)(A) does not purport to override the issuance of such a restraining order. This subsection of the TRIA provides as follows:

17

> Notwithstanding any other provision of law, . . . any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7).

28 U.S.C. § 1610(f)(1)(A) (2000). The Ungars contend that the "notwithstanding" clause overrides all legal barriers to execution that prevent them from obtaining these HLF assets in satisfaction of their judgment against Hamas.

The purpose of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, is to set forth principles by which a federal court decides a foreign state's claim that its property is immune from jurisdiction.[9] 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."). Subject to certain international agreements involving the United States, a foreign state's property in the United States is immune from attachment arrest and execution

---

[9] United States Code, Title 28. Judiciary and Judicial Procedure, Part IV. Jurisdiction and Venue, Chapter 97. Jurisdictional Immunities of Foreign States, states its purpose as follows:

§ 1602. Findings and declaration of purpose

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

18

except as provided in 28 U.S.C. §§ 1610 and 1611. 28 U.S.C. § 1609. The TRIA amended § 1610 of the FSIA, which is titled "Exceptions to the immunity from attachment or execution" to make available assets that might otherwise be immune from execution. The TRIA's legislative history clarifies that the purpose of § 1610(f)(1)(A) is "to strip a terrorist state of its immunity from execution or attachment in aid of execution." 148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin); *see also Hill v. Republic of Iraq*, 2003 WL 21057173 at *2 (D. D.C. Mar. 11, 2003) (holding that the § 1610(f)(1)(A) notwithstanding clause "overrides any immunity from execution that blocked [terrorist party] property might otherwise enjoy"). Thus, the purpose of § 1610(f)(1)(A) appears to be to provide a general exception to a foreign state's immunity from execution and attachment. *See* TRIA, Pub. L. No. 107-297, Title II, section 201(a), 116 Stat. 2322, 2337 (2002) (where the general nature of section 201(a) is emphasized as follows: "In General. Notwithstanding any other provision of law . . . .")

We conclude that the "notwithstanding" language relied on by the Ungars appears to target statutory immunities to execution. The criminal forfeiture statute does not immunize HLF bank accounts from writs of execution. The challenged restraining order freezes and preserves the accounts until the claims to them can be prioritized in ancillary proceedings. The TRIA does not address these circumstances. Because the issues at bar do not involve a foreign state's or terrorist party's FSIA immunity from execution, we find no basis to conclude that § 1610(f)(1)(A) preempts, trumps, or otherwise interferes with the operation of 21 U.S.C. § 853 criminal forfeiture provisions.

F. No Intervening Precedent has Changed the Fifth Circuit's Holding that Federal Rule of Civil Procedure 65 applies to § 853(e)(1)(A) Restraining Order

The Ungars assert that the notice and hearing requirements of Federal Rule of Civil Procedure 65 apply to ex parte restraining orders and injunctions issued under 21 U.S.C. § 853(e)(1)(A). Arguing that the restraining order was aimed entirely at the Ungars, not at the criminal defendants, the Ungars maintain that they should have been provided prior notice and a hearing as required by Rule 65. They contend that failure to comply with Rule 65 notice and hearing requirements violated their Fifth Amendment due process rights and rendered the restraining order void.

The Government asserts that Federal Rule of Civil Procedure 65 notice must be given to the property owner, HLF, and that this notice was given, via the indictment. The Government further asserts that HLF does not have an automatic right to a hearing under the forfeiture statute. The Government points out that the Ungars cite no authority for the proposition that a third party with an unperfected interest in a criminal defendant's forfeitable property has a right under Rule 65 to notice and a hearing prior to the entry of a forfeiture restraining order. Moreover, the Government argues, the Ungars are not the only judgment creditors that can seek to attach HLF's blocked assets.

The Government also contends that the Federal Rule of Civil Procedure 65 ten-day time limit for temporary restraining orders does not apply to ex parte post-indictment forfeiture restraining orders. Section 853 provides a ten-day limit for ex parte pre-indictment orders and a ninety-day limit for other pre-indictment orders, but provides no time limit for post-indictment restraining orders. Therefore, the Government argues, § 853 post-indictment restraining orders, like preliminary injunctions, have an indefinite duration.

1. *Applicable Law*

Upon application of the United States, a district court may enter a restraining order or an injunction, or take any other action to preserve the availability of forfeitable property "[u]pon the

20

filing of an indictment or information charging a violation . . . for which criminal forfeiture may be ordered under this section and alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section." 21 U.S.C. § 853(e)(1)(A). The requirements of Federal Rule of Civil Procedure 65 apply to the issuance of restraining orders and injunctions issued pursuant to 21 U.S.C. § 853(e)(1)(A). *United States v. Thier*, 801 F.2d 1463, 1468 (5th Cir. 1986); *United States v. Melrose E. Subdivision*, 357 F.3d 493, 505 n.12 (5th Cir. 2004) ("As a general matter, the Federal Rules presumptively apply except to the extent that they actually conflict with a subsequent statute."). Federal Rule of Civil Procedure 65 provides, in pertinent part, as follows:

(a) Preliminary Injunction.

(1) Notice. No preliminary injunction shall be issued without notice to the adverse party.

. . . .

(b) Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if

(1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and

(2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is

granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order.

Although Federal Rule of Civil Procedure 65(b) allows the ex parte issuance of restraining orders under certain limited circumstances, it also provides that an ex parte restraining order is effective for a maximum of ten days unless the court extends it for one additional ten-day period for good cause shown, or unless the "party against whom the order is directed consents [to an extension]." Fed. R. Civ. P. 65(b); *Thier*, 801 F.2d at 1469; *Phillips v. Chas. Schreiner Bank*, 894 F.2d 127, 130 n.5 (5th Cir. 1990). An ex parte order that purports to be of indefinite duration is a preliminary injunction rather than a temporary restraining order. *Phillips*, 894 F.2d at 130 n5.

The Federal Rule of Civil Procedure 65(a)(1) notice requirement "mean[s] that where factual disputes are presented, the parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (footnote, citation, and internal quotation marks omitted). The Federal Rule of Civil Procedure 65(a)(1) notice should comply with Federal Rule of Civil Procedure 65(d), which requires five days' notice before a hearing on a motion. *Harris County, Tex. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 326 (5th Cir. 1999) (citing *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org.*, 446 F.2d 353, 358 (5th Cir.1971)). Because "[c]ompliance with Rule 65(a)(1) is mandatory," a preliminary injunction granted without adequate notice and a fair opportunity to oppose it should be vacated and remanded to the district court. *Harris County,* 177 F.3d at 326 (citing *Parker v. Ryan*, 960 F.2d 543, 544 (5th Cir. 1992)). The

22

language of Federal Rule of Civil Procedure 65(a)(1) requires notice to the "adverse party." In dealing with a preliminary injunction, the "adverse party" means the party adversely affected by the injunction, not the opponent in the underlying action. *Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992).

The Government contends that *Thier*'s application of Federal Rule of Civil Procedure 65 to § 853(e)(1)(A) ex parte, post indictment restraining orders was called into serious question by *United States v. Monsanto*, 491 U.S. 600 (1989), and asserts that, in light of *Monsanto*, the Ungars are not entitled to a Federal Rule of Civil Procedure 65 automatic hearing. "It is well-established that one panel of our court will not overturn another absent an intervening precedent by our court sitting en banc or a Supreme Court precedent." *FDIC v. Dawson*, 4 F.3d 1303, 1307 (5th Cir.1993); *see also United States v. Fowler*, 216 F.3d 459, 460 (5th Cir.2000); *United States v. Avants*, 367 F.3d 433, 441 (5th Cir.2004). Therefore, if the Ungars are an "adverse party" for purposes of Federal Rule of Civil Procedure 65, then we are constrained by *Thier* and its progeny to find that (1) the Ungars were entitled to notice, (2) absence of this notice requires that the restraining order be dissolved, and (3) the Ungars are entitled to notice and a hearing before the New York, South Carolina, or Washington bank accounts are restrained indefinitely –unless there is intervening precedent by our court, en banc, or by the Supreme Court.

2. *Thier and Monsanto in the United States Fifth Circuit Court of Appeals*

In *Thier*, 801 F.2d. at 1468, this court considered the absence of a specified duration for the post-indictment order in the language of § 853(e)(1)(A) and, inter alia, held the following:

> The statute does not on its face or by necessary implication bar minimum due process protections. The wording of § 853 does not expressly or impliedly negate the applicability of Fed. R. Civ. P. 65. The requirements of Rule 65 apply to the issuance

23

of all restraining orders and injunctions by the courts of the United States. Since those requirements were not excluded, they apply to restraining orders and injunctions issued pursuant to 21 U.S.C. § 853(e)(1)(A).

The Government correctly notes that the indictment constituted notice to HLF sufficient for issuance of a temporary restraining order, but under *Thier*'s application of Federal Rule of Civil Procedure 65,[10] the duration of that order could be no longer than ten days (twenty days, if HLF consented thereto). The district court specified that this ex parte restraining order "shall remain in full force and effect until further notice of this Court." Because of its indefinite duration, under *Thier*, this restraining order is a preliminary injunction issued in violation of Federal Rule of Civil Procedure 65(a)(1). *Cf. Phillips*, 894 F.2d at 130 n.5.

Citing *Melrose East Subdivision*, 357 F.3d at 504, the Government asserts that *Thier* was driven by the belief that Federal Rule of Civil Procedure 65 embodies "minimum due process protections" that must be enforced in criminal forfeiture proceedings, but that this theory was called into serious question by *Monsanto*. The Government asserts that this court should follow the approach adopted by the Tenth and Fourth Circuits that no automatic hearing is required under Federal Rule of Civil Procedure 65 in light of *Monsanto*, following *United States v. Jones*, 160 F.3d 641, 645-47 (10th Cir. 1998).

---

[10] As stated in *Thier*, 801 F.2d at 1468-1469,

> Congress has determined that the context of a post-indictment restraining order presents sufficient exigencies to satisfy the first requirement of Rule 65 that irreparable loss would occur before a hearing could take place. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 203, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3386. Therefore the government need not make any showing of potential irreparable loss other than the return of the described form of indictment. Congress intended for the indictment itself to constitute sufficient notice of the government's intent to seek forfeiture. *Id.*

24

In *Melrose East Subdivision*, the issue at bar was, at a hearing challenging the issuance of a pretrial restraining order pursuant to a civil forfeiture statute, whether the Government must show probable cause instead of substantial likelihood of success on the merits. The court observed that *Thier* found applicable to 21 U.S.C. § 853(e)(1)(A) the "substantial likelihood of success" standard typically required for preliminary injunctions but *Monsanto* had concluded that due process permitted the Government to restrain assets needed to pay counsel upon a showing of probable cause. Although the civil forfeiture statute in *Melrose East Subdivision* was "textually very similar" to § 853(e)(1)(A), there was no comment on whether *Monsanto* had changed *Thier* except as follows:

> Whether or not all of *Thier* remains good law in the context of 21 U.S.C. § 853(e)(1)(A), this new guidance from the Supreme Court convinces us that in the context of § 983(j)(1)(A) --a statute enacted after *Monsanto*– *Thier* should not be carried over to the extent that it would require the government to show more than probable cause in order to restrain assets.

*Melrose East Subdivision*, 357 F.3d at 504. *Thier*'s determination that Federal Rule of Civil Procedure 65 applies to 21 U.S.C. § 853(e)(1)(A) restraining orders was not discussed. *See Melrose East Subdivision*, 357 F.3d at 505 n.12. But the court did state the following:

> This case therefore does not implicate the question whether the district court may in its discretion hold a pre-restraint hearing, or indeed whether it must hold a pre-restraint hearing as a matter of due process. There is authority for the proposition that due process does not require a pre-restraint hearing in the context of post-indictment restraining orders under 21 U.S.C. § 853(e)(1)(A), the criminal analogue of § 983(j)(1)(A). *See United States v. Monsanto*, 924 F.2d 1186, 1192-93 (2d Cir. 1991) (en banc), on remand from 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); *United States v. Musson*, 802 F.2d 384, 387 (10th Cir. 1986). *But cf. United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52-57, 62, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that due process requires a hearing before the government may seize real property pending the resolution of a civil forfeiture action).

Thus, the Government is not alone in its assertion that Federal Rule of Civil Procedure 65 notice and hearing requirements do not apply to § 853 post-indictment restraining orders.

In addition, at least one district court within the Fifth Circuit has chosen to follow the Tenth Circuit rather than *Thier*. Faced with a motion to dissolve a § 853 ex parte restraining order, it held that a post-restraint, pre-conviction hearing is not required before denial of defendant's motion to dissolve "absent a prima facie showing, made through a properly supported motion, that [the defendant] needs the assets for reasonable and necessary legal and/or living expenses, and that the grand jury erred in determining the assets are either proceeds from or traceable to the offenses charged in the Superseding Indictment." *United States v. Causey,* 309 F. Supp. 2d 917, 924-27 (S.D. Tex. 2004) (following *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) and citing *United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002)). In effect, this district court decided that the Federal Rule of Civil Procedure 65 ten day limit for ex parte orders did not apply to the § 853(e)(1)(A) restraining order.[11]

The *Causey* district court correctly noted that, "[b]ecause the district court held an extensive four-day hearing on the issue of probable cause and because the Second Circuit had not addressed the procedural due process issue, the [*Monsanto*] Court did not consider whether due process requires a pre-restraint hearing." *Causey* 309 F. Supp.2d at 925. Likewise, the *Causey* district court accurately observed that *Melrose* did not address the question whether the district court may in its discretion, or must as a matter of due process, hold a pre-restraint hearing. *Id.* at 926. Yet, there has been no en banc precedent from this court that changes *Their*'s ruling that a § 853 ex parte, post

---

[11] *Cf. United States v. Gelb*, 826 F.2d 1175, 1176 (2d Cir. 1987):
Although a post-indictment restraining order based on RICO's forfeiture provisions may issue with a minimum of process, Congress appears to have provided no durational limitation to its reach short of the termination of the related criminal prosecution. Compare 18 U.S.C. § 1963(d)(1)(B) and (d)(2). A post-indictment restraining order is thus very similar to a preliminary injunction.

26

indictment restraining order is subject to Federal Rule of Civil Procedure 65. Nevertheless, as we noted in *Melrose*, there is authority for the Government's position that *Monsanto* has cast serious doubt upon *Thier*'s holding that a hearing is required for such a restraining order.

There is a circuit split on this issue. *See United States v. Monsanto*, 924 F.2d 1186, 1192-93 (2d Cir. 1991) (en banc), on remand from 491 U.S. 600 (1989) (finding no Rule 65 requirement for a § 853 ex parte, post indictment restraining order); *accord United States v. Musson*, 802 F.2d 384, 387 (10th Cir. 1986); *accord United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998). In contrast to these Second and Tenth Circuit cases, shortly after *Monsanto* was decided, the Ninth Circuit reaffirmed its decision in *United States v. Crozier*, 777 F.2d 1376 (9th Cir.1985), that Federal Rule of Civil Procedure 65 applies to post-indictment pre-conviction restraining orders:[12]

> In the absence of valid procedural guidelines in the forfeiture provisions of the Act, we held that Rule 65 of the Federal Rules of Civil Procedure applies to require a district court to hold a prompt hearing after a TRO is granted to determine whether a preliminary injunction should issue. [*Crozier*, 777 F.2d] at 1384. This holding is not inconsistent with *United States v. Monsanto*, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989). There, the Supreme Court explicitly refused to decide whether a hearing in connection with a restraining order pending trial was required and what type of hearing, if any, would satisfy the requirements of due process. *Id*. 109 S.Ct. at 2666 n. 10. The law of our circuit therefore remains that in order for a restraining order under § 853 to be constitutional, the district court must hold a hearing under Rule 65 to determine whether probable cause exists to issue an injunction.

*United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990). Likewise, the law of the Fifth Circuit remains unchanged because there has been no intervening en banc Fifth Circuit or Supreme Court precedent: the requirements of Federal Rule of Civil Procedure 65 apply to the issuance of restraining orders and injunctions issued pursuant to 21 U.S.C. § 853(e)(1)(A). *Thier*, 801 F.2d at 1468.

---

[12] *See* this court's discussion of *Crozier* in *Thier*, 801 F.2d at 1467.

*Monsanto* changed the standard of proof for the Federal Rule of Civil Procedure 65 probable cause hearing, but not this circuit's holding that Rule 65 governs a § 853(e)(1)(A) restraining order.

The instant § 853(e)(1)(A) order restrains indefinitely the New York, South Carolina, and Washington bank accounts that are the subject of this appeal; therefore it is to be treated as a preliminary injunction. *Phillips*, 894 F.2d at 130 n5. The Ungars are adverse parties for Federal Rule of Civil Procedure 65 purposes, having been named in the Government's application for the restraining order and having an interest in some of the bank accounts specified in the order, which interest is (1) adverse to both parties to this criminal case, and (2) adversely affected by the restraining order. As an ex parte "preliminary injunction," Federal Rule of Civil Procedure 65(a)(1) requires notice to adverse parties.

The record reveals no compliance with Federal Rule of Civil Procedure 65(a)(1) notice provision. "Compliance with Rule 65(a)(1) is mandatory," and a preliminary injunction granted without adequate notice and a fair opportunity to oppose it should be vacated and remanded to the district court. *Harris County*, 177 F.3d at 326 (citing *Parker v. Ryan*, 960 F.2d at 544).

## CONCLUSION

For the foregoing reasons, we DENY the Ungars' motion for summary disposition and DENY the Ungars' request that we direct the district court not to enter further orders that restrain HLF's interest in these bank accounts. We VACATE the restraining order, and REMAND the matter to the district court with directions that any further proceedings be in accord with this opinion.

28