United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 18, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-11282

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, ETC; ET AL.,

Defendants,

DAVID J. STRACHMAN, in his capacity as administrator of the
Estate of Yaron Ungar; DVIR UNGAR; YISHAI UNGAR; JUDITH UNGAR;
MEIR UNGAR; MICHAL COHEN; AMICHAI UNGAR; DAFNA UNGAR,

Appellants.

_____

On Appeal from the United States District Court
For the Northern District of Texas

_____

Before JONES, Chief Judge, KING, JOLLY, DAVIS, SMITH, WIENER,
BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT,
PRADO, and OWEN, Circuit Judges.

BENAVIDES and STEWART, Circuit Judges:

We took this case en banc to reevaluate the panel's treatment

of *United States v. Thier*, 801 F.2d 1463 (5th Cir. 1986). Relying

on *Thier*, which held that the notice and hearing requirements of

FED. R. CIV. P. 65 applied to restraining orders issued under the

criminal forfeiture statute, a panel of this Court vacated the

district court's restraining order for noncompliance with Rule 65. *United States v. Holy Land Found. for Relief and Dev.*, 445 F.3d 771 (5th Cir. 2006), *vacated for reh'g en banc* (2006). For the reasons that follow, we conclude that *Thier* was wrongly decided, and is now overruled. We further conclude that, having overruled *Thier*, we have no authority to consider the Ungars' additional arguments. If the Ungars wish to challenge the ruling of the district court below, they must first do so in that court, either in a hearing under 21 U.S.C. § 853, or through some other procedural mechanism.

## I.   FACTS AND PROCEDURAL HISTORY

Appellant David Strachman represents the estates of husband and wife, Yaron and Efrat Ungar, who were killed during a terrorist attack. In February 2004, Strachman, along with members of the Ungar family and their representatives ("the Ungars"), obtained a $116,409,123 default judgment against Hamas[1] in Rhode Island's federal district court pursuant to the civil provisions of the Antiterrorism Act of 1991, 18 U.S.C. § 2333.[2] *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 238, 242 (D.R.I. 2004). That district court determined that its

---

[1]According to the indictment against the Holy Land Foundation, "[t]he Harakat al-Muqawamah al-Islamiyya is Arabic for 'The Islamic Resistance Movement' and is known by the acronym HAMAS. HAMAS, which is sometimes referred to by its followers as 'The Movement,' is a terrorist organization based in the West Bank and Gaza Strip."

[2]18 U.S.C. § 2333 provides a cause of action for American nationals injured in their person, property, or business by reason of an act of international terrorism.

judgment was enforceable against the assets of the Holy Land Foundation for Relief and Development ("HLF").[3] *Id.* at 241. Based on this judgment, federal district courts in New York, South Carolina, and Washington issued writs of execution against HLF that the Ungars allege were levied in the respective jurisdictions on or before September 13, 2004.

Meanwhile, on July 26, 2004, the United States filed a forty-two count indictment against HLF in federal district court for the Northern District of Texas. The indictment charged HLF with material support of a terrorist organization, tax evasion, and money laundering, and the Government sought forfeiture of HLF property. In order to preserve HLF's assets in the event of a conviction, the Government sought a restraining order from the district court on September 24, 2004. The district court issued that order *ex parte* with the authority given it in the criminal forfeiture statute, 21 U.S.C. § 853(e)(1)(A). That order indefinitely froze the assets of HLF and its financial agents, including the bank accounts in New York, South Carolina and Washington.

The Ungars were suddenly unable to obtain the funds upon which

_____

[3]Without reciting the entire history of HLF, we note that there is strong evidence that HLF works as a fundraiser for Hamas. On December 4, 2001, the Treasury Department determined that HLF acted "for or on behalf of" Hamas and was thus a Specially Designated Terrorist under Executive Order 12947 and a Specially Designated Global Terrorist under Executive Order 13224. *See Estates of Ungar ex rel. Strachman*, 304 F. Supp. 2d at 241.

3

they levied, and which they believed belonged to them. They appealed the restraining order to this Court, alleging, among other things, that it was entered without providing them adequate notice or a fair opportunity to be heard. On April 4, 2006, a panel of this Court agreed with them. After deciding several jurisdictional and statutory questions, the panel concluded that it was constrained by our precedent in *United States v. Thier,* 801 F.2d 1463 (5th Cir. 1986)*,* to apply the notice provisions of Federal Rule of Civil Procedure 65 to the *ex parte* restraining order. Therefore, the panel vacated the restraining order for noncompliance with Rule 65 and remanded the case to district court for any further proceedings. 445 F.3d at 793. In doing so, the panel repeatedly explained that it was bound to follow *Thier* until such time as it was overruled either by the Supreme Court or by our Court sitting en banc. That time has come.

## II. STANDARD OF REVIEW

Ordinarily we review a district court's order of injunction for abuse of discretion, but where, as here, the district court's decision turns on the application of statutes or procedural rules, our review of that interpretation is de novo. *Cf. Castillo v. Cameron County, Tex.*, 238 F.3d 339, 347 (5th Cir. 2001) ("Although the district court's decision to continue the injunctions is to be reviewed for an abuse of discretion, . . . because the district court's decision . . . turns on the application of § 3626(b) of the

4

[Prison Litigation Reform Act], that interpretation is reviewed de novo.") (citations omitted).

## III. DISCUSSION

We begin our inquiry with the question of the Ungars' standing to appeal the restraining order to this Court. Unlike the panel, however, our primary concern here is not with the three constitutional requirements of standing, per se. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (identifying three requirements that constitute "irreducible constitutional minimum" of standing: "injury in fact," causation, and redressability). The panel opinion properly dealt with the question of the Ungars' personal stake in the outcome of this controversy, and we have no reason to revisit that inquiry. 445 F.3d at 779-81. Indeed, even the Government does not now challenge the legitimacy of the Ungars' interest in this case. Rather, its more specific argument, and our primary concern, is whether the Ungars are barred by statute from bringing their arguments to this Court at this time.

The Government argues that the Ungars must pursue their interest in HLF's property in accordance with the scheme set out in the federal criminal forfeiture statute, 21 U.S.C. § 853.[4] If this

---

[4]We note that the Government did not advance this argument in any detail before the panel. By the time the case reached the en banc Court, however, the Government had taken up this position as its primary ground for relief. At oral argument, counsel for the Government explained that the shift was the result of "further

5

is true, then the Ungars likely would have to wait until HLF's criminal trial is over and, if HLF is convicted, assert their interest in a post-trial hearing in the district court. *See* 21 U.S.C. § 853(n) (detailing post-trial hearing). At that hearing, the district judge would assess the primacy of their interest relative to that of the Government and any other third-party claimants, and distribute the property accordingly. The Government urges, therefore, that this appeal is an attempt to circumvent that statutory scheme and must be dismissed.

The Ungars respond in two ways. First, they assert that they are, in their words, the "victims" of a restraining order that was issued without notice or a hearing, and therefore our holding in *Thier*, which extended Rule 65's protections to parties "adverse" to a criminal restraining order, allows them to appeal that order to this Court. Second, they argue that they need not wait for a post-trial hearing because § 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322, 2337, trumps the criminal forfeiture statute. We consider these arguments in turn.

A. The Ungars' right to notice under *Thier*

The Ungars argue that they have a right to appeal the district

---

deliberation within the Department since the panel's opinion was issued." Whatever the reason for the change, we now have the benefit of full briefing on this issue and can give it its due consideration at this time. To be sure, though the argument was not made forcefully, it is nonetheless preserved for our review.

court's restraining order to this Court, rather than resort to the § 853 hearing, because we gave them that right in *United States v. Thier,* 801 F.2d 1463 (5th Cir. 1986). *Thier* presented the case of a post-indictment restraining order, issued by a district court pursuant to 21 U.S.C. § 853(e)(1)(A), which prevented a criminal defendant from disposing of his assets pending the outcome of his trial. *Id.* at 1465–66. The Government had requested the order and put forth sufficient evidence to convince the district judge that Thier "might frustrate justice and endanger the government's interest in these properties by placing them beyond the jurisdiction of the court." *Id.* at 1466. Importantly, the court issued the order *ex parte* and ruled that it was to stay in effect until further ordered by the court. Thier was served with a copy of the order the next day. At his request, the court later held a hearing to consider modifying the order, but declined to do so. Thier then appealed to this Court, alleging, *inter alia*, that the district court's restraint of his assets without an adversary hearing violated his due process rights under the Fifth Amendment.

A panel of this Court held that post-indictment restraining orders and injunctions issued pursuant to 21 U.S.C. § 853(e)(1)(A) would not offend due process so long as the requirements of Federal Rule of Civil Procedure 65 were satisfied. *Id.* at 1468. Rule 65 provides certain procedural safeguards to the "adverse party" when a district court issues an injunction or restraining order. In the

7

case of an *ex parte* restraining order, it states that such order is only effective for ten days unless the court chooses to extend it for one additional ten-day period for good cause, or the party against whom the order is directed consents to an extension. FED. R. CIV. P. 65(b); *Thier*, 801 F.2d at 1469. The *ex parte* restraining order in *Thier* exceeded these hearing and duration limits, and so the panel remanded the case with directions to conduct a hearing on reasonable notice and in accordance with the other strictures of Rule 65. Thus, *Thier* stands for the proposition that Rule 65 protects "adverse parties"[5] whenever an injunction or restraining order is issued pursuant to the criminal forfeiture statute, 21 U.S.C. § 853(e)(1)(A).

The Ungars argue that they are similarly situated to Thier, that they are an "adverse party" as that term is used in Rule 65, and that they were not given adequate notice or a hearing in the district court. Accordingly, they maintain that they, like Thier, have the right to appeal that order to this Court. The panel

---

[5]Notably, Rule 65, as a rule of civil procedure, does not speak in terms of criminal defendants, but rather uses the more generic term, "adverse parties." To be sure, the Ungars, unlike Thier, are not defendants in the case below, and the restraining order on HLF's assets does not mention the Ungars at all. However, the Ungars argue that the order was nonetheless directed at them because they were in the process of executing their judgment against HLF's assets. The panel agreed and adjudged the Ungars to be an "adverse party" for purposes of Rule 65, which triggered the panel's compliance with *Thier*. 445 F.3d at 792. However, that question is now moot in light of our decision to overrule *Thier*, and we need not consider it at this time.

considered this argument at great length and concluded that it was "constrained by *Thier* and its progeny" to dissolve the restraining order. 445 F.3d at 789–93. We are not so constrained. We decide, here and now, that *Thier* is no longer the law of this Circuit.

There are several reasons why we have chosen to overrule *Thier*. First, shortly after the case was decided, it was called into doubt by the Supreme Court in *United States v. Monsanto*, 491 U.S. 600 (1989). In fact, that opinion overruled *Thier* insofar as *Thier* applied a higher burden on the Government than the probable cause standard to justify pretrial restraint of forfeitable assets. *Id.* at 615.[6] It is true that the Court specifically declined to decide whether due process might require a hearing before a pretrial restraining order could be imposed, *id.* at 615 n.10, but the opinion nevertheless speaks in strong terms about the primacy we ought to give to the language of § 853. It states that "the

---

[6]We recently examined this tension in greater detail in *United States v. Melrose East Subdivision*, 357 F.3d 493, 504–05 (5th Cir. 2004), but we briefly recount that observation here. In addition to requiring an indictment based on probable cause, *Thier* demanded that the Government satisfy the traditional four-part test for a preliminary injunction, one part of which is to demonstrate a substantial likelihood of success on the merits, in order to carry its burden at a § 853(e)(1)(A) hearing. *See Thier*, 801 F.2d at 1470. This undoubtedly imposes a higher burden than probable cause, but *Monsanto* makes plain that probable cause alone is sufficient to satisfy due process. 491 U.S. at 615 ("We conclude . . . that assets in a defendant's possession may be restrained in the way they were here based on a finding of probable cause to believe that the assets are forfeitable."). *See generally Melrose East Subdivision*, 357 F.3d at 504–05 & n.12 (discussing cases in greater detail).

language of § 853 is plain and unambiguous: all assets falling within its scope are to be forfeited upon conviction," and that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *Id.* at 606–07. This language strongly suggests that we need not read into § 853 the protections of a wholly separate rule of civil procedure in order to satisfy the requirements of due process. The apparent incongruity of the opinions recently prompted us to observe that "[s]ome aspects of *Thier* appear to be in tension with *Monsanto*, and future cases may need to consider whether certain portions of *Thier* were overruled." *Melrose East Subdivision*, 357 F.3d at 504.

In addition to the spirit of *Monsanto*, however, we are overruling *Thier* because it is out of step with the reasoning of several of our sister circuits.[7] Most circuits that have spoken to the issue do not resort to Rule 65's guarantee of a hearing to satisfy due process, but they also do not hold that a hearing is never required. Rather, they rely on the time-honored test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine when a hearing is required. *See, e.g., United States v. Jones*, 160 F.3d

---

[7]We first catalogued the different approaches of other circuits in *Melrose East Subdivision*. *See* 357 F.3d at 499–500 (summarizing cases).

641, 645–48 (10th Cir. 1998); *United States v. Monsanto*, 924 F.2d 1186, 1193–98 (2d Cir. 1991) (on remand from 491 U.S. 600 (1989)); *United States v. Moya-Gomez*, 860 F.2d 706, 729–30 (7th Cir. 1988); *United States v. Harvey*, 814 F.2d 905, 928–29 (4th Cir. 1987), *superceded as to other issues, In re Forfeiture Hearing As to Caplin & Drysdale, Chartered*, 837 F.2d 637 (4th Cir. 1988) (en banc), *aff'd*, 491 U.S. 617 (1989).  Under this method, which we adopt, when the Government is seeking forfeiture and secures an indictment to that effect based on probable cause, a court may issue a restraining order without prior notice or a hearing.  In some cases, however, due process will require that the district court then promptly hold a hearing at which the property owner can contest the restraining order, without waiting until trial to do so.  To determine when such a hearing is required, we consider the three *Eldridge* factors: the private interest that will be affected by the restraint; the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the burdens that the hearing would entail.  424 U.S. at 335. As we observed in *Melrose East Subdivision*, circuits employing this test have found that a property owner's interest is particularly great when he or she needs the restrained assets to pay for legal defense on associated criminal charges, or to cover ordinary and reasonable living

11

expenses. *See Melrose East Subdivision*, 357 F.3d at 499–500 (collecting cases).

We note that the Ninth Circuit still adheres to the view expressed in *Thier*, that the protections of Rule 65 apply to all injunctions and restraining orders under § 853(e)(1)(A). *See United States v. Roth*, 912 F.2d 1131 (9th Cir. 1990). On the other end of the spectrum, the Eleventh Circuit maintains that no pretrial hearing is ever required, even when the restrained assets are needed to pay counsel. *See United States v. Register*, 182 F.3d 820, 835 (11th Cir. 1999) ("We appear to be the only circuit holding that, although pre-trial restraint of assets needed to retain counsel implicates the Due Process Clause, the trial itself satisfies this requirement." (citing *United States v. Bissell*, 866 F.2d 1343, 1352–54 (11th Cir. 1989))). With due respect to both of those circuits, we believe the rule we adopt strikes an appropriate balance between those views. It will spare the Government from frivolous challenges that might impede its ongoing criminal investigations, but does so without jeopardizing the rights of property owners to access their assets in a timely fashion when necessary.

Returning now to the Ungars, we find that their claim is substantially affected by our decision to overturn *Thier*. It was *Thier* that incorporated Federal Rule of Civil Procedure 65, with its procedural safeguards for "adverse parties." That language, in

12

turn, allowed the Ungars to bring their due process claim to this Court, for even though they were not parties to the underlying criminal action, the panel did consider them to be "adverse parties" for purposes of Rule 65.[8] 445 F.3d at 792. Under the rule we announce today, however, there is no need to consider Rule 65, and there are no such protections for "adverse parties." Instead, if the Ungars wish to challenge the district court's order, they must be able to satisfy the *Eldridge* factors. We turn now to the question of whether they can do so.

B. The Ungars' interest in the forfeitable assets

The Ungars argued before the panel that the district court in Texas had no jurisdiction to restrain the bank accounts in question because other courts in New York, South Carolina and Washington had already levied writs of execution against those accounts, rendering them *in custodia legis*.[9] The panel considered this argument at great length, examined the status of each account individually, and concluded:

> Our review of the record reveals that none of the levies
> was perfected so as to transfer possession or control of

---

[8]"When dealing with a preliminary injunction, the 'adverse party' means the party adversely affected by the injunction, not the opponent in the underlying action." *Parker v. Ryan*, 960 F.2d 543, 545 (5th Cir. 1992).

[9]*In custodia legis* means "[i]n the custody or keeping of the law . . . ." BLACK'S LAW DICTIONARY 768 (6th ed. 1990); *see also In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005) (explaining that *in custodia legis* means "literally, 'in the custody of the law'; loosely, 'in the care of the court'").

13

> HLF's interest in the bank accounts to the respective
> federal district courts *or to the Ungars* in such a manner
> that the Ungars may now challenge the Texas district
> court's jurisdiction to enter the restraining order.

445 F.3d at 783 (emphasis added). This reasoning was sound, and it bears directly on the question of the Ungars' property interest in the accounts. Therefore, before going forward, we note that the entire portion of the panel opinion explaining that jurisdiction was not defeated on this basis, specifically Part III.D, is hereby REINSTATED. 445 F.3d at 782–85.

Having accepted the panel's conclusion that the Ungars had no perfected property interest in the subject accounts, we find that the private interest affected by the restraint in this case is minimal at best.[10] Accordingly, they do not have any right under *Eldridge* to request a hearing at this time, nor do they have any right to appeal the district court's restraining order to this Court. They are simply judgment creditors, and while they may have

---

[10]While the first of the *Eldridge* factors largely disposes of the issue in this case, we note for the sake of completeness that the other two factors also favor the Government. The risk of an erroneous deprivation of the Ungars' interest is minimal in light of the safeguards afforded to the Ungars by 21 U.S.C. § 853. *See infra* Part III.C. As for the Government's interest, we have already referenced the Supreme Court's view that "Congress could not have chosen stronger words" to express its view that forfeiture should be both mandatory and broad in scope. *Monsanto*, 491 U.S. at 606–07. From this we draw the related conclusion that it would be a significant burden on the Government to have to defend the forfeiture order from attack by a third party during the course of an ongoing criminal prosecution. While future cases may present a different balance of interests, we find that the *Eldridge* factors do not support the Ungars' request for a hearing at this time. *See Mathews v. Eldridge*, 424 U.S. at 335.

14

a viable third-party claim on the assets of HLF, there is currently no legal basis for them to appeal a restraining order on those assets. In fact, the relevant law is to be found in the criminal forfeiture statute itself, which lays out a detailed scheme by which third-party claimants like the Ungars can assert their interest in the restrained assets.

C. Third-party claims under 21 U.S.C. § 853

The criminal forfeiture statute is designed to balance the Government's interest in efficient and orderly prosecution with the rights of defendants and third parties who claim an interest in forfeitable property. Two key provisions of the statute make clear that the Ungars may not intercede in the pending HLF prosecution at this time, at least not in the fashion in which they have done so.[11]

Section 853(k) reads:

Except as provided in subsection (n) of this section, no party claiming an interest in property subject to forfeiture under this section may—
    (1) intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or
    (2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

This bar on intervention makes an exception for the process set out in section (n). That section, in turn, makes plain that the Ungars

_____

[11]The Ungars concede that they *could* follow the procedure set forth in § 853, but add that they need not do so because TRIA gives them an independent remedy. We consider this argument in greater detail in Part III.D, *infra*.

15

will have a chance to assert their interest in the subject property, but only *after* the termination of the pending criminal case. In the event of a conviction, the court will enter an order of forfeiture, which will transfer Holy Land's assets to the Government of the United States. Then:

> (1) Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

> (2) Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

21 U.S.C. § 853(n).

It is plain, therefore, that if HLF is convicted[12] and its assets are forfeited to the Government, the Ungars will receive notice of that occurrence. At that time they may petition the court for a hearing. The statute further states that such a hearing is to take place within thirty days of the filing of the

---

[12]It goes without saying that if the Government fails to convict HLF, then the Ungars are in the same position they were before the criminal case arose. They are still judgment creditors, and they may continue to execute that judgment against HLF's assets in the relevant jurisdictions.

petition, if practicable.  21 U.S.C. § 853(n)(4).  Moreover, the court is empowered to consolidate all petitions for such hearings into a single proceeding, so as to adjudicate all competing claims at once.  *Id.*  In this way, then, the hearing is similar to a bankruptcy proceeding, at which the judge will consider the validity and priority of each party's alleged interest in the property.  If the district court determines that a third party, be it the Ungars or any other claimant,[13] has an interest superior to that of the Government, it will amend the forfeiture order accordingly.  § 853(n)(6).

We can understand the Ungars' frustration at having to await the completion of the Government's case, but we are readily satisfied that the system set out in § 853 provides them with due process.  To be sure, the Ungars will have their day in court, but under the scheme set forth in § 853, they cannot have it today, and they cannot have it in *this* Court.  They must wait for the criminal

---

[13]We note that at least one other group of plaintiffs, the Boim family, have secured a judgment against HLF in the same fashion as the Ungars.  Amended Final Judgment in a Civil Case, *Boim v. Quranic Literacy Inst.*, No. 00-C-2905 (N.D. Ill. Mar. 2, 2005). That case is now on appeal in the Seventh Circuit, but if their judgment is affirmed, then presumably they, too, will have an interest to assert in a post-trial forfeiture hearing in the district court in Texas.  We suspect that potential conflicts of this sort were one reason that Congress chose to ban third-party intervention during the pendency of a criminal prosecution, and to move all such claims into a post-trial hearing instead.  While this delay may impose a burden on the claimants, the countervailing benefits to the Government, the court, and even the claimants themselves, are obvious.

17

prosecution to conclude, and, if HLF is convicted, they must take their arguments to that district court in the first instance.

D. The Ungars' Reliance on TRIA

Despite the clear language of § 853, the Ungars assert that it does not apply to them. They argue that they need not wait for the post-trial hearing described in § 853(n), because another statute, TRIA § 201(a), trumps the criminal forfeiture statute. The relevant portion of that Act provides that:

> *Notwithstanding any other provision of law*, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added). The Ungars place great weight on the "notwithstanding" clause in this statute. On the strength of that clause, counsel for the Ungars likens TRIA to "legal kryptonite," and argues that it supercedes the criminal forfeiture statute and allows the Ungars to reach the assets that are "blocked" by the district court's § 853 restraining order. TRIA, he says, makes the Ungars' claim qualitatively different from a typical judgment creditor's claim to forfeitable assets. On this reading, because the court's restraining order currently prevents the Ungars from executing their judgment against HLF's assets, that

18

order is in conflict with TRIA § 201(a) and must be declared void.

The Government agrees that TRIA trumps previous laws that limit the attachment and execution of blocked assets, but maintains that the criminal forfeiture statute is not such a law. On the Government's reading, § 853 does not "block" any of HLF's assets as that term is used in § 201(a). Rather, says the Government, the criminal forfeiture statute sets out a system whereby the court can distribute those funds in an appropriate manner. In short, § 853 does not say that the Ungars cannot execute their judgment; it merely tells them when and how. Therefore, the two statutes do not conflict with one another, but work in tandem, and the "notwithstanding" clause should not be read to override § 853.

This is certainly an interesting legal question, but we have no license to consider it at this time. The reason we have to refrain is that the Ungars never presented this TRIA argument to a district court in the first instance. They are presently on appeal in this Court without being a party to the action below, or even trying to make themselves a party to it. Importantly, this is not a question of their having waived the argument, but of the propriety of our considering arguments that have never been before a lower court. If TRIA is the powerful tool that the Ungars say it is, then they must invoke it in the district court first, either in the § 853 hearing or through some other procedural channel, but we are not authorized to consider that question until a lower court has done so.

## IV.  CONCLUSION

For the foregoing reasons, Part III.D of the panel opinion is REINSTATED, while all other portions remain VACATED.  Having overruled *Thier*, there is no authority allowing the Ungars to appeal to this Court without first presenting their arguments to the district court.  Accordingly, the appeal is DISMISSED.